# RING *v.* ARIZONA

No. 01–488.   Argued April 22, 2002—Decided June 24, 2002

586

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. SCALIA, J., filed a concurring opinion, in which THOMAS, J., joined, *post*, p. 610. KENNEDY, J., filed a concurring opinion, *post*, p. 613. BREYER, J., filed an opinion concurring in the judgment, *post*, p. 613. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., joined, *post*, p. 619.

*Andrew D. Hurwitz* argued the cause for petitioner. With him on the briefs were *John A. Stookey* and *Daniel L. Kaplan.*

*Janet Napolitano*, Attorney General of Arizona, argued the cause for respondent. With her on the brief were *Patrick Irvine*, Solicitor General, *Kent E. Cattani*, and *Robert L. Ellman* and *Kathleen P. Sweeney*, Assistant Attorneys General.*

JUSTICE GINSBURG delivered the opinion of the Court.

This case concerns the Sixth Amendment right to a jury trial in capital prosecutions. In Arizona, following a jury adjudication of a defendant's guilt of first-degree murder, the trial judge, sitting alone, determines the presence or absence of the aggravating factors required by Arizona law for imposition of the death penalty.

In *Walton* v. *Arizona*, 497 U. S. 639 (1990), this Court held that Arizona's sentencing scheme was compatible with the Sixth Amendment because the additional facts found by the judge qualified as sentencing considerations, not as "element[s] of the offense of capital murder." *Id.*, at 649. Ten years later, however, we decided *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), which held that the Sixth Amendment does not permit a defendant to be "expose[d] . . . to a penalty

---

*Briefs of *amici curiae* urging affirmance were filed for the State of Alabama et al. by *Bill Pryor*, Attorney General of Alabama, *Nathan A. Forrester*, Solicitor General, and *A. Vernon Barnett IV* and *Michael B. Billingsley*, Deputy Solicitors General, joined by the Attorneys General for their respective States as follows: *Ken Salazar* of Colorado, *M. Jane Brady* of Delaware, *Robert A. Butterworth* of Florida, *Alan G. Lance* of Idaho, *Steve Carter* of Indiana, *Mike Moore* of Mississippi, *Mike McGrath* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *D. Michael Fisher* of Pennsylvania, *Charles M. Condon* of South Carolina, *Mark L. Shurtleff* of Utah, and *Jerry W. Kilgore* of Virginia; for Arizona Voice for Crime Victims, Inc., et al. by *Steve Twist* and *Douglas E. Beloof;* and for the Criminal Justice Legal Foundation by *Kent S. Scheidegger.*

*exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.*, at 483. This prescription governs, *Apprendi* determined, even if the State characterizes the additional findings made by the judge as "sentencing factor[s]." *Id.*, at 492.

*Apprendi*'s reasoning is irreconcilable with *Walton*'s holding in this regard, and today we overrule *Walton* in relevant part. Capital defendants, no less than noncapital defendants, we conclude, are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment.

I

At the trial of petitioner Timothy Ring for murder, armed robbery, and related charges, the prosecutor presented evidence sufficient to permit the jury to find the facts here recounted. On November 28, 1994, a Wells Fargo armored van pulled up to the Dillard's department store at Arrowhead Mall in Glendale, Arizona. Tr. 57, 60–61 (Nov. 14, 1996). Courier Dave Moss left the van to pick up money inside the store. *Id.*, at 61, 73–74. When he returned, the van, and its driver, John Magoch, were gone. *Id.*, at 61–62.

Later that day, Maricopa County Sheriff's Deputies found the van—its doors locked and its engine running—in the parking lot of a church in Sun City, Arizona. *Id.*, at 99–100 (Nov. 13, 1996). Inside the vehicle they found Magoch, dead from a single gunshot to the head. *Id.*, at 101. According to Wells Fargo records, more than $562,000 in cash and $271,000 in checks were missing from the van. *Id.*, at 10 (Nov. 18, 1996).

Prompted by an informant's tip, Glendale police sought to determine whether Ring and his friend James Greenham were involved in the robbery. The police investigation revealed that the two had made several expensive cash purchases in December 1994 and early 1995. *E. g., id.*, at 153–156 (Nov. 14, 1996); *id.*, at 90–94 (Nov. 21, 1996). Wiretaps

were then placed on the telephones of Ring, Greenham, and a third suspect, William Ferguson. *Id.*, at 19–21 (Nov. 18, 1996).

In one recorded phone conversation, Ring told Ferguson that Ring might "cu[t] off" Greenham because "[h]e's too much of a risk": Greenham had indiscreetly flaunted a new truck in front of his ex-wife. State's Exh. 49A, pp. 11–12. Ring said he could cut off his associate because he held "both [Greenham's] and mine." *Id.*, at 11. The police engineered a local news broadcast about the robbery investigation; they included in the account several intentional inaccuracies. Tr. 3–5, 13–14 (Nov. 19, 1996). On hearing the broadcast report, Ring left a message on Greenham's answering machine to "remind me to talk to you tomorrow and tell you about what was on the news tonight. Very important, and also fairly good." State's Exh. 55A, p. 2.

After a detective left a note on Greenham's door asking him to call, Tr. 115–118 (Nov. 18, 1996), Ring told Ferguson that he was puzzled by the attention the police trained on Greenham. "[H]is house is clean," Ring said; "[m]ine, on the other hand, contains a very large bag." State's Exh. 70A, p. 7.

On February 14, 1995, police furnished a staged reenactment of the robbery to the local news, and again included deliberate inaccuracies. Tr. 5 (Nov. 19, 1996). Ferguson told Ring that he "laughed" when he saw the broadcast, and Ring called it "humorous." State's Exh. 80A, p. 3. Ferguson said he was "not real worried at all now"; Ring, however, said he was "slightly concern[ed]" about the possibility that the police might eventually ask for hair samples. *Id.*, at 3–4.

Two days later, the police executed a search warrant at Ring's house, discovering a duffel bag in his garage containing more than $271,000 in cash. Tr. 107–108, 111, 125 (Nov. 20, 1996). They also found a note with the number "575, 995" on it, followed by the word "splits" and the letters "F," "Y," and "T." *Id.*, at 127–130. The prosecution asserted

that "F" was Ferguson, "Y" was "Yoda" (Greenham's nickname), and "T" was Timothy Ring.  *Id.*, at 42 (Dec. 5, 1996).

Testifying in his own defense, Ring said the money seized at his house was startup capital for a construction company he and Greenham were planning to form.  *Id.*, at 10–11 (Dec. 3, 1996).  Ring testified that he made his share of the money as a confidential informant for the Federal Bureau of Investigation and as a bail bondsman and gunsmith.  *Id.*, at 162, 166–167, 180 (Dec. 2, 1996).  But an FBI agent testified that Ring had been paid only $458, *id.*, at 47 (Nov. 20, 1996), and other evidence showed that Ring had made no more than $8,800 as a bail bondsman, *id.*, at 48–51 (Nov. 21, 1996); *id.*, at 21 (Nov. 25, 1996).

The trial judge instructed the jury on alternative charges of premeditated murder and felony murder.  The jury deadlocked on premeditated murder, with 6 of 12 jurors voting to acquit, but convicted Ring of felony murder occurring in the course of armed robbery.  See Ariz. Rev. Stat. Ann. §§ 13–1105(A) and (B) (West 2001) ("A person commits first degree murder if . . . [a]cting either alone or with one or more other persons the person commits or attempts to commit . . . [one of several enumerated felonies] . . . and in the course of and in furtherance of the offense or immediate flight from the offense, the person or another person causes the death of any person. . . . Homicide, as prescribed in [this provision] requires no specific mental state other than what is required for the commission of any of the enumerated felonies.").

As later summed up by the Arizona Supreme Court, "the evidence admitted at trial failed to prove, beyond a reasonable doubt, that [Ring] was a major participant in the armed robbery or that he actually murdered Magoch."  200 Ariz. 267, 280, 25 P. 3d 1139, 1152 (2001).  Although clear evidence connected Ring to the robbery's proceeds, nothing submitted at trial put him at the scene of the robbery.  See *ibid.*  Furthermore, "[f]or all we know from the trial evidence," the Arizona court stated, "[Ring] did not participate in, plan, or even expect the killing.  This lack of evidence no doubt ex-

plains why the jury found [Ring] guilty of felony, but not premeditated, murder." *Ibid.*

Under Arizona law, Ring could not be sentenced to death, the statutory maximum penalty for first-degree murder, unless further findings were made. The State's first-degree murder statute prescribes that the offense "is punishable by death or life imprisonment as provided by § 13–703." Ariz. Rev. Stat. Ann. § 13–1105(C) (West 2001). The cross-referenced section, § 13–703, directs the judge who presided at trial to "conduct a separate sentencing hearing to determine the existence or nonexistence of [certain enumerated] circumstances . . . for the purpose of determining the sentence to be imposed." § 13–703(C) (West Supp. 2001). The statute further instructs: "The hearing shall be conducted before the court alone. The court alone shall make all factual determinations required by this section or the constitution of the United States or this state." *Ibid.*

At the conclusion of the sentencing hearing, the judge is to determine the presence or absence of the enumerated "aggravating circumstances"[1] and any "mitigating circum-

---

[1] The aggravating circumstances, enumerated in Ariz. Rev. Stat. Ann. § 13–703(G) (West Supp. 2001), are:

"1. The defendant has been convicted of another offense in the United States for which under Arizona law a sentence of life imprisonment or death was imposable.

"2. The defendant was previously convicted of a serious offense, whether preparatory or completed.

"3. In the commission of the offense the defendant knowingly created a grave risk of death to another person or persons in addition to the person murdered during the commission of the offense.

"4. The defendant procured the commission of the offense by payment, or promise of payment, of anything of pecuniary value.

"5. The defendant committed the offense as consideration for the receipt, or in expectation of the receipt, of anything of pecuniary value.

"6. The defendant committed the offense in an especially heinous, cruel or depraved manner.

"7. The defendant committed the offense while in the custody of or on authorized or unauthorized release from the state department of corrections, a law enforcement agency or a county or city jail.

stances."[2] The State's law authorizes the judge to sentence the defendant to death only if there is at least one aggravating circumstance and "there are no mitigating circumstances sufficiently substantial to call for leniency." § 13–703(F).

Between Ring's trial and sentencing hearing, Greenham pleaded guilty to second-degree murder and armed robbery. He stipulated to a 27½-year sentence and agreed to cooperate with the prosecution in the cases against Ring and Ferguson. Tr. 35–37 (Oct. 9, 1997).

Called by the prosecution at Ring's sentencing hearing, Greenham testified that he, Ring, and Ferguson had been planning the robbery for several weeks before it occurred. According to Greenham, Ring "had I guess taken the role as leader because he laid out all the tactics." *Id.*, at 39. On the day of the robbery, Greenham said, the three watched the armored van pull up to the mall. *Id.*, at 45. When Magoch opened the door to smoke a cigarette, Ring shot him with a rifle equipped with a homemade silencer. *Id.*, at 42, 44–45. Greenham then pushed Magoch's body aside and drove the van away. *Id.*, at 45. At Ring's direction, Greenham drove to the church parking lot, where he and Ring transferred the money to Ring's truck. *Id.*, at 46, 48. Later, Greenham recalled, as the three robbers were dividing up the money,

---

"8. The defendant has been convicted of one or more other homicides, as defined in § 13–1101, which were committed during the commission of the offense.

"9. The defendant was an adult at the time the offense was committed or was tried as an adult and the murdered person was under fifteen years of age or was seventy years of age or older.

"10. The murdered person was an on duty peace officer who was killed in the course of performing his official duties and the defendant knew, or should have known, that the murdered person was a peace officer."

[2] The statute enumerates certain mitigating circumstances, but the enumeration is not exclusive. "The court shall consider as mitigating circumstances any factors proffered by the defendant or the state which are relevant in determining whether to impose a sentence less than death . . . ." § 13–703(H).

Ring upbraided him and Ferguson for "forgetting to congratulate [Ring] on [his] shot." *Id.*, at 60.

On cross-examination, Greenham acknowledged having previously told Ring's counsel that Ring had nothing to do with the planning or execution of the robbery. *Id.*, at 85–87. Greenham explained that he had made that prior statement only because Ring had threatened his life. *Id.*, at 87. Greenham also acknowledged that he was now testifying against Ring as "pay back" for the threats and for Ring's interference in Greenham's relationship with Greenham's ex-wife. *Id.*, at 90–92.

On October 29, 1997, the trial judge entered his "Special Verdict" sentencing Ring to death. Because Ring was convicted of felony murder, not premeditated murder, the judge recognized that Ring was eligible for the death penalty only if he was Magoch's actual killer or if he was "a major participant in the armed robbery that led to the killing and exhibited a reckless disregard or indifference for human life." App. to Pet. for Cert. 46a–47a; see *Enmund* v. *Florida*, 458 U. S. 782 (1982) (Eighth Amendment requires finding that felony-murder defendant killed or attempted to kill); *Tison* v. *Arizona*, 481 U. S. 137, 158 (1987) (qualifying *Enmund*, and holding that Eighth Amendment permits execution of felony-murder defendant, who did not kill or attempt to kill, but who was a "major participa[nt] in the felony committed" and who demonstrated "reckless indifference to human life").

Citing Greenham's testimony at the sentencing hearing, the judge concluded that Ring "is the one who shot and killed Mr. Magoch." App. to Pet. for Cert. 47a. The judge also found that Ring was a major participant in the robbery and that armed robbery "is unquestionably a crime which carries with it a grave risk of death." *Ibid.*

The judge then turned to the determination of aggravating and mitigating circumstances. See § 13–703. He found two aggravating factors. First, the judge determined that Ring committed the offense in expectation of receiving something

of "pecuniary value," as described in § 13–703; "[t]aking the cash from the armored car was the motive and reason for Mr. Magoch's murder and not just the result." App. to Pet. for Cert. 49a. Second, the judge found that the offense was committed "in an especially heinous, cruel or depraved manner." *Ibid.* In support of this finding, he cited Ring's comment, as reported by Greenham at the sentencing hearing, expressing pride in his marksmanship. *Id.*, at 49a–50a. The judge found one nonstatutory mitigating factor: Ring's "minimal" criminal record. *Id.*, at 52a. In his judgment, that mitigating circumstance did not "call for leniency"; he therefore sentenced Ring to death. *Id.*, at 53a.

On appeal, Ring argued that Arizona's capital sentencing scheme violates the Sixth and Fourteenth Amendments to the U. S. Constitution because it entrusts to a judge the finding of a fact raising the defendant's maximum penalty. See *Jones* v. *United States*, 526 U. S. 227 (1999); *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000). The State, in response, noted that this Court had upheld Arizona's system in *Walton* v. *Arizona*, 497 U. S. 639 (1990), and had stated in *Apprendi* that *Walton* remained good law.

Reviewing the death sentence, the Arizona Supreme Court made two preliminary observations. *Apprendi* and *Jones*, the Arizona high court said, "raise some question about the continued viability of *Walton*." 200 Ariz., at 278, 25 P. 3d, at 1150. The court then examined the *Apprendi* majority's interpretation of Arizona law and found it wanting. *Apprendi*, the Arizona court noted, described Arizona's sentencing system as one that "'requir[es] judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death,' and not as a system that 'permits a judge to determine the existence of a factor which makes a crime a capital offense.'" 200 Ariz., at 279, 25 P. 3d, at 1151 (quoting *Apprendi*, 530 U. S., at 496–497). JUSTICE O'CONNOR's *Apprendi* dissent, the Arizona court noted, squarely rejected

the *Apprendi* majority's characterization of the Arizona sentencing scheme: "A defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." 200 Ariz., at 279, 25 P. 3d, at 1151 (quoting *Apprendi*, 530 U. S., at 538).

After reciting this Court's divergent constructions of Arizona law in *Apprendi*, the Arizona Supreme Court described how capital sentencing in fact works in the State. The Arizona high court concluded that "the present case is precisely as described in Justice O'Connor's dissent [in *Apprendi*]— Defendant's death sentence required the judge's factual findings." 200 Ariz., at 279, 25 P. 3d, at 1151. Although it agreed with the *Apprendi* dissent's reading of Arizona law, the Arizona court understood that it was bound by the Supremacy Clause to apply *Walton*, which this Court had not overruled. It therefore rejected Ring's constitutional attack on the State's capital murder judicial sentencing system. 200 Ariz., at 280, 25 P. 3d, at 1152.

The court agreed with Ring that the evidence was insufficient to support the aggravating circumstance of depravity, *id.*, at 281–282, 25 P. 3d, at 1153–1154, but it upheld the trial court's finding on the aggravating factor of pecuniary gain. The Arizona Supreme Court then reweighed that remaining factor against the sole mitigating circumstance (Ring's lack of a serious criminal record), and affirmed the death sentence. *Id.*, at 282–284, 25 P. 3d, at 1154–1156.

We granted Ring's petition for a writ of certiorari, 534 U. S. 1103 (2002), to allay uncertainty in the lower courts caused by the manifest tension between *Walton* and the reasoning of *Apprendi*. See, *e. g., United States* v. *Promise*, 255 F. 3d 150, 159–160 (CA4 2001) (en banc) (calling the continued authority of *Walton* in light of *Apprendi* "perplexing"); *Hoffman* v. *Arave*, 236 F. 3d 523, 542 (CA9 2001) ("*Apprendi* may

raise some doubt about *Walton.*"); *People* v. *Kaczmarek,* 318 Ill. App. 3d 340, 351–352, 741 N. E. 2d 1131, 1142 (2000) ("[W]hile it appears *Apprendi* extends greater constitutional protections to noncapital, rather than capital, defendants, the Court has endorsed this precise principle, and we are in no position to secondguess that decision here."). We now reverse the judgment of the Arizona Supreme Court.

## II

Based solely on the jury's verdict finding Ring guilty of first-degree felony murder, the maximum punishment he could have received was life imprisonment. See 200 Ariz., at 279, 25 P. 3d, at 1151 (citing Ariz. Rev. Stat. § 13–703). This was so because, in Arizona, a "death sentence may not legally be imposed . . . unless at least one aggravating factor is found to exist beyond a reasonable doubt." 200 Ariz., at 279, 25 P. 3d, at 1151 (citing § 13–703). The question presented is whether that aggravating factor may be found by the judge, as Arizona law specifies, or whether the Sixth Amendment's jury trial guarantee,[3] made applicable to the States by the Fourteenth Amendment, requires that the aggravating factor determination be entrusted to the jury.[4]

---

[3] "In all criminal prosecutions, the accused shall enjoy the right to a . . . trial, by an impartial jury . . . ."

[4] Ring's claim is tightly delineated: He contends only that the Sixth Amendment required jury findings on the aggravating circumstances asserted against him. No aggravating circumstance related to past convictions in his case; Ring therefore does not challenge *Almendarez-Torres* v. *United States,* 523 U. S. 224 (1998), which held that the fact of prior conviction may be found by the judge even if it increases the statutory maximum sentence. He makes no Sixth Amendment claim with respect to mitigating circumstances. See *Apprendi* v. *New Jersey,* 530 U. S. 466, 490–491, n. 16 (2000) (noting "the distinction the Court has often recognized between facts in aggravation of punishment and facts in mitigation" (citation omitted)). Nor does he argue that the Sixth Amendment required the jury to make the ultimate determination whether to impose the death penalty. See *Proffitt* v. *Florida,* 428 U. S. 242, 252 (1976) (plurality opinion) ("[I]t has never [been] suggested that jury sentencing is constitution-

As earlier indicated, see *supra*, at 588, 595–596, this is not the first time we have considered the constitutionality of Arizona's capital sentencing system. In *Walton* v. *Arizona*, 497 U. S. 639 (1990), we upheld Arizona's scheme against a charge that it violated the Sixth Amendment. The Court had previously denied a Sixth Amendment challenge to Florida's capital sentencing system, in which the jury recommends a sentence but makes no explicit findings on aggravating circumstances; we so ruled, *Walton* noted, on the ground that "the Sixth Amendment does not require that the specific findings authorizing the imposition of the sentence of death be made by the jury." *Id.*, at 648 (quoting *Hildwin* v. *Florida*, 490 U. S. 638, 640–641 (1989) *(per curiam)*). *Walton* found unavailing the attempts by the defendant-petitioner in that case to distinguish Florida's capital sentencing system from Arizona's. In neither State, according to *Walton*, were the aggravating factors "elements of the offense"; in both States, they ranked as "sentencing considerations" guiding the choice between life and death. 497 U. S., at 648 (internal quotation marks omitted).

*Walton* drew support from *Cabana* v. *Bullock*, 474 U. S. 376 (1986), in which the Court held there was no constitutional bar to an appellate court's finding that a defendant killed, attempted to kill, or intended to kill, as *Enmund* v. *Florida*, 458 U. S. 782 (1982), required for imposition of the death penalty in felony-murder cases. The *Enmund* finding could be made by a court, *Walton* maintained, because it entailed no "'element of the crime of capital murder'"; it "only place[d] 'a substantive limitation on sentencing.'" 497

---

ally required."). He does not question the Arizona Supreme Court's authority to reweigh the aggravating and mitigating circumstances after that court struck one aggravator. See *Clemons* v. *Mississippi*, 494 U. S. 738, 745 (1990). Finally, Ring does not contend that his indictment was constitutionally defective. See *Apprendi*, 530 U. S., at 477, n. 3 (Fourteenth Amendment "has not . . . been construed to include the Fifth Amendment right to 'presentment or indictment of a Grand Jury'").

U. S., at 649 (quoting *Cabana,* 474 U. S., at 385–386). "If the Constitution does not require that the *Enmund* finding be proved as an element of the offense of capital murder, and does not require a jury to make that finding," *Walton* stated, "we cannot conclude that a State is required to denominate aggravating circumstances 'elements' of the offense or permit only a jury to determine the existence of such circumstances." 497 U. S., at 649.

In dissent in *Walton,* JUSTICE STEVENS urged that the Sixth Amendment requires "a jury determination of facts that must be established before the death penalty may be imposed." *Id.,* at 709. Aggravators "operate as statutory 'elements' of capital murder under Arizona law," he reasoned, "because in their absence, [the death] sentence is unavailable." *Id.,* at 709, n. 1. "If th[e] question had been posed in 1791, when the Sixth Amendment became law," JUSTICE STEVENS said, "the answer would have been clear," for "[b]y that time,

> "the English jury's role in determining critical facts in homicide cases was entrenched. As fact-finder, the jury had the power to determine not only whether the defendant was guilty of homicide but also the degree of the offense. Moreover, *the jury's role in finding facts that would determine a homicide defendant's eligibility for capital punishment was particularly well established.* Throughout its history, the jury determined which homicide defendants would be subject to capital punishment by making factual determinations, many of which related to difficult assessments of the defendant's state of mind. By the time the Bill of Rights was adopted, the jury's right to make these determinations was unquestioned." *Id.,* at 710–711 (quoting White, Fact-Finding and the Death Penalty: The Scope of a Capital Defendant's Right to Jury Trial, 65 Notre Dame L. Rev. 1, 10–11 (1989)).

*Walton* was revisited in *Jones* v. *United States*, 526 U. S. 227 (1999). In that case, we construed the federal carjacking statute, 18 U. S. C. § 2119 (1994 ed. and Supp. V), which, at the time of the criminal conduct at issue, provided that a person possessing a firearm who "takes a motor vehicle . . . from the person or presence of another by force and violence or by intimidation . . . shall—(1) be . . . imprisoned not more than 15 years . . . , (2) if serious bodily injury . . . results, be . . . imprisoned not more than 25 years . . . , and (3) if death results, be . . . imprisoned for any number of years up to life . . . ." The question presented in *Jones* was whether the statute "defined three distinct offenses or a single crime with a choice of three maximum penalties, two of them dependent on sentencing factors exempt from the requirements of charge and jury verdict." 526 U. S., at 229.

The carjacking statute, we recognized, was "susceptible of [both] constructions"; we adopted the one that avoided "grave and doubtful constitutional questions." *Id.,* at 239 (quoting *United States ex rel. Attorney General* v. *Delaware & Hudson Co.,* 213 U. S. 366, 408 (1909)). Section 2119, we held, established three separate offenses. Therefore, the facts—causation of serious bodily injury or death—necessary to trigger the escalating maximum penalties fell within the jury's province to decide. See *Jones,* 526 U. S., at 251–252. Responding to the dissenting opinion, the *Jones* Court restated succinctly the principle animating its view that the carjacking statute, if read to define a single crime, might violate the Constitution: "[U]nder the Due Process Clause of the Fifth Amendment and the notice and jury trial guarantees of the Sixth Amendment, any fact (other than prior conviction) that increases the maximum penalty for a crime must be charged in an indictment, submitted to a jury, and proven beyond a reasonable doubt." *Id.,* at 243, n. 6.

*Jones* endeavored to distinguish certain capital sentencing decisions, including *Walton.* Advancing a "careful reading of *Walton*'s rationale," the *Jones* Court said: *Walton* "charac-

terized the finding of aggravating facts falling within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling of the sentencing range available." 526 U. S., at 251.

Dissenting in *Jones*, JUSTICE KENNEDY questioned the Court's account of *Walton*. The aggravating factors at issue in *Walton*, he suggested, were not merely circumstances for consideration by the trial judge in exercising sentencing discretion within a statutory range of penalties. "Under the relevant Arizona statute," JUSTICE KENNEDY observed, "Walton could not have been sentenced to death unless the trial judge found at least one of the enumerated aggravating factors. Absent such a finding, the maximum potential punishment provided by law was a term of imprisonment." 526 U. S., at 272 (citation omitted). *Jones*, JUSTICE KENNEDY concluded, cast doubt—needlessly in his view—on the vitality of *Walton*:

> "If it is constitutionally impermissible to allow a judge's finding to increase the maximum punishment for carjacking by 10 years, it is not clear why a judge's finding may increase the maximum punishment for murder from imprisonment to death. In fact, *Walton* would appear to have been a better candidate for the Court's new approach than is the instant case." 526 U. S., at 272.

One year after *Jones*, the Court decided *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000). The defendant-petitioner in that case was convicted of, *inter alia*, second-degree possession of a firearm, an offense carrying a maximum penalty of ten years under New Jersey law. See *id.*, at 469–470. On the prosecutor's motion, the sentencing judge found by a preponderance of the evidence that Apprendi's crime had been motivated by racial animus. That finding triggered application of New Jersey's "hate crime enhancement," which doubled Apprendi's maximum authorized sentence. The judge sentenced Apprendi to 12 years in prison, 2 years over the maximum that would have applied but for the enhancement.

We held that Apprendi's sentence violated his right to "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." *Id.*, at 477 (quoting *United States* v. *Gaudin*, 515 U. S. 506, 510 (1995)). That right attached not only to Apprendi's weapons offense but also to the "hate crime" aggravating circumstance. New Jersey, the Court observed, "threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race." *Apprendi*, 530 U. S., at 476. "Merely using the label 'sentence enhancement' to describe the [second act] surely does not provide a principled basis for treating [the two acts] differently." *Ibid.*

The dispositive question, we said, "is one not of form, but of effect." *Id.*, at 494. If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact—no matter how the State labels it—must be found by a jury beyond a reasonable doubt. See *id.*, at 482–483. A defendant may not be "expose[d] . . . to a penalty *exceeding* the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.*, at 483; see also *id.*, at 499 (SCALIA, J., concurring) ("[A]ll the facts which must exist in order to subject the defendant to a legally prescribed punishment *must* be found by the jury.").

*Walton* could be reconciled with *Apprendi*, the Court finally asserted. The key distinction, according to the *Apprendi* Court, was that a conviction of first-degree murder in Arizona carried a maximum sentence of death. "[O]nce a jury has found the defendant guilty of all the elements of an offense which carries as its maximum penalty the sentence of death, it may be left to the judge to decide whether that maximum penalty, rather than a lesser one, ought to be imposed." 530 U. S., at 497 (emphasis deleted) (quoting

*Almendarez-Torres* v. *United States*, 523 U. S. 224, 257, n. 2 . (1998) (SCALIA, J., dissenting)).

The *Apprendi* dissenters called the Court's distinction of *Walton* "baffling." 530 U. S., at 538 (opinion of O'CONNOR, J.). The Court claimed that "the jury makes all of the findings necessary to expose the defendant to a death sentence." *Ibid.* That, the dissent said, was "demonstrably untrue," for a "defendant convicted of first-degree murder in Arizona cannot receive a death sentence unless a judge makes the factual determination that a statutory aggravating factor exists. Without that critical finding, the maximum sentence to which the defendant is exposed is life imprisonment, and not the death penalty." *Ibid.* *Walton*, the *Apprendi* dissenters insisted, if properly followed, would have required the Court to uphold Apprendi's sentence. "If a State can remove from the jury a factual determination that makes the difference between life and death, as *Walton* holds that it can, it is inconceivable why a State cannot do the same with respect to a factual determination that results in only a 10-year increase in the maximum sentence to which a defendant is exposed." 530 U. S., at 537 (opinion of O'CONNOR, J.).

The Arizona Supreme Court, as we earlier recounted, see *supra*, at 595–596, found the *Apprendi* majority's portrayal of Arizona's capital sentencing law incorrect, and the description in JUSTICE O'CONNOR's dissent precisely right: "Defendant's death sentence required the judge's factual findings." 200 Ariz., at 279, 25 P. 3d, at 1151. Recognizing that the Arizona court's construction of the State's own law is authoritative, see *Mullaney* v. *Wilbur*, 421 U. S. 684, 691 (1975), we are persuaded that *Walton*, in relevant part, cannot survive the reasoning of *Apprendi*.

In an effort to reconcile its capital sentencing system with the Sixth Amendment as interpreted by *Apprendi*, Arizona first restates the *Apprendi* majority's portrayal of Arizona's system: Ring was convicted of first-degree murder, for which Arizona law specifies "death or life imprisonment" as the

only sentencing options, see Ariz. Rev. Stat. Ann. § 13–1105(C) (West 2001); Ring was therefore sentenced within the range of punishment authorized by the jury verdict. See Brief for Respondent 9–19. This argument overlooks *Apprendi*'s instruction that "the relevant inquiry is one not of form, but of effect." 530 U. S., at 494. In effect, "the required finding [of an aggravated circumstance] expose[d] [Ring] to a greater punishment than that authorized by the jury's guilty verdict." *Ibid.;* see 200 Ariz., at 279, 25 P. 3d, at 1151. The Arizona first-degree murder statute "authorizes a maximum penalty of death only in a formal sense," *Apprendi*, 530 U. S., at 541 (O'CONNOR, J., dissenting), for it explicitly cross-references the statutory provision requiring the finding of an aggravating circumstance before imposition of the death penalty. See § 13–1105(C) ("First degree murder is a class 1 felony and is punishable by death or life imprisonment *as provided by § 13–703*." (emphasis added)). If Arizona prevailed on its opening argument, *Apprendi* would be reduced to a "meaningless and formalistic" rule of statutory drafting. See 530 U. S., at 541 (O'CONNOR, J., dissenting).

Arizona also supports the distinction relied upon in *Walton* between elements of an offense and sentencing factors. See *supra*, at 598–599; Tr. of Oral Arg. 28–29. As to elevation of the maximum punishment, however, *Apprendi* renders the argument untenable;[5] *Apprendi* repeatedly in-

---

[5] In *Harris* v. *United States, ante,* p. 545, a majority of the Court concludes that the distinction between elements and sentencing factors continues to be meaningful as to facts increasing the minimum sentence. See *ante,* at 567 (plurality opinion) ("The factual finding in *Apprendi* extended the power of the judge, allowing him or her to impose a punishment exceeding what was authorized by the jury. [A] finding [that triggers a mandatory minimum sentence] restrain[s] the judge's power, limiting his or her choices within the authorized range. It is quite consistent to maintain that the former type of fact must be submitted to the jury while the latter need not be."); *ante,* at 569 (BREYER, J., concurring in part and

structs in that context that the characterization of a fact or circumstance as an "element" or a "sentencing factor" is not determinative of the question "who decides," judge or jury. See, *e. g.*, 530 U. S., at 492 (noting New Jersey's contention that "[t]he required finding of biased purpose is not an 'element' of a distinct hate crime offense, but rather the traditional 'sentencing factor' of motive," and calling this argument "nothing more than a disagreement with the rule we apply today"); *id.*, at 494, n. 19 ("[W]hen the term 'sentence enhancement' is used to describe an increase beyond the maximum authorized statutory sentence, it is the functional equivalent of an element of a greater offense than the one covered by the jury's guilty verdict."); *id.*, at 495 ("[M]erely because the state legislature placed its hate crime sentence enhancer within the sentencing provisions of the criminal code does not mean that the finding of a biased purpose to intimidate is not an essential element of the offense." (internal quotation marks omitted)); see also *id.*, at 501 (THOMAS, J., concurring) ("[I]f the legislature defines some core crime and then provides for increasing the punishment of that crime upon a finding of some aggravating fact[,] . . . the core crime and the aggravating fact together constitute an aggravated crime, just as much as grand larceny is an aggravated form of petit larceny. The aggravating fact is an element of the aggravated crime.").

Even if facts increasing punishment beyond the maximum authorized by a guilty verdict standing alone ordinarily must be found by a jury, Arizona further urges, aggravating circumstances necessary to trigger a death sentence may nonetheless be reserved for judicial determination. As Arizona's counsel maintained at oral argument, there is no doubt that

---

concurring in judgment) ("[T]he Sixth Amendment permits judges to apply sentencing factors—whether those factors lead to a sentence beyond the statutory maximum (as in *Apprendi*) or the application of a mandatory minimum (as here).").

"[d]eath is different." Tr. of Oral Arg. 43. States have constructed elaborate sentencing procedures in death cases, Arizona emphasizes, because of constraints we have said the Eighth Amendment places on capital sentencing. Brief for Respondent 21–25 (citing *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam)*); see also *Maynard* v. *Cartwright,* 486 U. S. 356, 362 (1988) ("Since *Furman,* our cases have insisted that the channeling and limiting of the sentencer's discretion in imposing the death penalty is a fundamental constitutional requirement for sufficiently minimizing the risk of wholly arbitrary and capricious action."); *Apprendi,* 530 U. S., at 522–523 (THOMAS, J., concurring) ("[I]n the area of capital punishment, unlike any other area, we have imposed special constraints on a legislature's ability to determine what facts shall lead to what punishment—we have restricted the legislature's ability to define crimes.").

Apart from the Eighth Amendment provenance of aggravating factors, Arizona presents "no specific reason for excepting capital defendants from the constitutional protections . . . extend[ed] to defendants generally, and none is readily apparent." *Id.,* at 539 (O'CONNOR, J., dissenting). The notion "that the Eighth Amendment's restriction on a state legislature's ability to define capital crimes should be compensated for by permitting States more leeway under the Fifth and Sixth Amendments in proving an aggravating fact necessary to a capital sentence . . . is without precedent in our constitutional jurisprudence." *Ibid.*

In various settings, we have interpreted the Constitution to require the addition of an element or elements to the definition of a criminal offense in order to narrow its scope. See, *e. g., United States* v. *Lopez,* 514 U. S. 549, 561–562 (1995) (suggesting that addition to federal gun possession statute of "express jurisdictional element" requiring connection between weapon and interstate commerce would render statute constitutional under Commerce Clause); *Branden-*

*burg* v. *Ohio*, 395 U. S. 444, 447 (1969) *(per curiam)* (First Amendment prohibits States from "proscrib[ing] advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action"); *Lambert* v. *California*, 355 U. S. 225, 229 (1957) (Due Process Clause of Fourteenth Amendment requires "actual knowledge of the duty to register or proof of the probability of such knowledge" before ex-felon may be convicted of failing to register presence in municipality). If a legislature responded to one of these decisions by adding the element we held constitutionally required, surely the Sixth Amendment guarantee would apply to that element. We see no reason to differentiate capital crimes from all others in this regard.

Arizona suggests that judicial authority over the finding of aggravating factors "may . . . be a better way to guarantee against the arbitrary imposition of the death penalty." Tr. of Oral Arg. 32. The Sixth Amendment jury trial right, however, does not turn on the relative rationality, fairness, or efficiency of potential factfinders. Entrusting to a judge the finding of facts necessary to support a death sentence might be

> "an admirably fair and efficient scheme of criminal justice designed for a society that is prepared to leave criminal justice to the State. . . . The founders of the American Republic were not prepared to leave it to the State, which is why the jury-trial guarantee was one of the least controversial provisions of the Bill of Rights. It has never been efficient; but it has always been free." *Apprendi*, 530 U. S., at 498 (SCALIA, J., concurring).

In any event, the superiority of judicial factfinding in capital cases is far from evident. Unlike Arizona, the great majority of States responded to this Court's Eighth Amendment decisions requiring the presence of aggravating circum-

stances in capital cases by entrusting those determinations to the jury.[6]

Although "'the doctrine of *stare decisis* is of fundamental importance to the rule of law[,]' . . . [o]ur precedents are not sacrosanct." *Patterson* v. *McLean Credit Union,* 491 U. S. 164, 172 (1989) (quoting *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 494 (1987)). "[W]e have overruled prior decisions where the necessity and propriety of doing so has been established." 491 U. S., at 172. We are satisfied that this is such a case.

---

[6] Of the 38 States with capital punishment, 29 generally commit sentencing decisions to juries. See Ark. Code Ann. § 5–4–602 (1993); Cal. Penal Code Ann. § 190.3 (West 1999); Conn. Gen. Stat. § 53a–46a (2001); Ga. Code Ann. § 17–10–31.1 (Supp. 1996); Ill. Comp. Stat. Ann., ch. 720, § 5/9–1(d) (West 1993); Kan. Stat. Ann. § 21–4624(b) (1995); Ky. Rev. Stat. Ann. § 532.025(1)(b) (1993); La. Code Crim. Proc. Ann., Art. § 905.1 (West 1997); Md. Ann. Code, Art. 27, § 413(b) (1996); Miss. Code Ann. § 99–19–101 (1973–2000); Mo. Rev. Stat. §§ 565.030, 565.032 (1999 and Supp. 2002); Nev. Rev. Stat. Ann. § 175.552 (Michie 2001); N. H. Rev. Stat. Ann. § 630:5(II) (1996); N. J. Stat. Ann. § 2C:11–3(c) (Supp. 2001); N. M. Stat. Ann. § 31–20A–1 (2000); N. Y. Crim. Proc. Law § 400.27 (McKinney Supp. 2001–2002); N. C. Gen. Stat. § 15A–2000 (1999); Ohio Rev. Code Ann. § 2929.03 (West 1997); Okla. Stat., Tit. 21, § 701.10(A) (Supp. 2001); Ore. Rev. Stat. Ann. § 163.150 (1997); 42 Pa. Cons. Stat. § 9711 (Supp. 2001); S. C. Code Ann. § 16–3–20(B) (1985); S. D. Codified Laws § 23A–27A–2 (1998); Tenn. Code Ann. § 39–13–204 (Supp. 2000); Tex. Code Crim. Proc. Ann., Art. 37.071 (Vernon Supp. 2001); Utah Code Ann. § 76–3–207 (Supp. 2001); Va. Code Ann. § 19.2–264.3 (2000); Wash. Rev. Code § 10.95.050 (1990); Wyo. Stat. Ann. § 6–2–102 (2001).

Other than Arizona, only four States commit both capital sentencing factfinding and the ultimate sentencing decision entirely to judges. See Colo. Rev. Stat. § 16–11–103 (2001) (three-judge panel); Idaho Code § 19–2515 (Supp. 2001); Mont. Code Ann. § 46–18–301 (1997); Neb. Rev. Stat. § 29–2520 (1995).

Four States have hybrid systems, in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determinations. See Ala. Code §§ 13A–5–46, 13A–5–47 (1994); Del. Code Ann., Tit. 11, § 4209 (1995); Fla. Stat. Ann. § 921.141 (West 2001); Ind. Code Ann. § 35–50–2–9 (Supp. 2001).

For the reasons stated, we hold that *Walton* and *Apprendi* are irreconcilable; our Sixth Amendment jurisprudence cannot be home to both. Accordingly, we overrule *Walton* to the extent that it allows a sentencing judge, sitting without a jury, to find an aggravating circumstance necessary for imposition of the death penalty. See 497 U. S., at 647–649. Because Arizona's enumerated aggravating factors operate as "the functional equivalent of an element of a greater offense," *Apprendi*, 530 U. S., at 494, n. 19, the Sixth Amendment requires that they be found by a jury.

\* \* \*

> "The guarantees of jury trial in the Federal and State Constitutions reflect a profound judgment about the way in which law should be enforced and justice administered. . . . If the defendant preferred the common-sense judgment of a jury to the more tutored but perhaps less sympathetic reaction of the single judge, he was to have it." *Duncan* v. *Louisiana*, 391 U. S. 145, 155–156 (1968).

The right to trial by jury guaranteed by the Sixth Amendment would be senselessly diminished if it encompassed the factfinding necessary to increase a defendant's sentence by two years, but not the factfinding necessary to put him to death. We hold that the Sixth Amendment applies to both. The judgment of the Arizona Supreme Court is therefore reversed, and the case is remanded for further proceedings not inconsistent with this opinion.[7]

*It is so ordered.*

---

[7] We do not reach the State's assertion that any error was harmless because a pecuniary gain finding was implicit in the jury's guilty verdict. See *Neder* v. *United States*, 527 U. S. 1, 25 (1999) (this Court ordinarily leaves it to lower courts to pass on the harmlessness of error in the first instance).

JUSTICE SCALIA, with whom JUSTICE THOMAS joins, concurring.

The question whether *Walton* v. *Arizona*, 497 U. S. 639 (1990), survives our decision in *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), confronts me with a difficult choice. What compelled Arizona (and many other States) to specify particular "aggravating factors" that must be found before the death penalty can be imposed, see 1973 Ariz. Sess. Laws ch. 138, §5 (originally codified as Ariz. Rev. Stat. §13–454), was the line of this Court's cases beginning with *Furman* v. *Georgia*, 408 U. S. 238 (1972) *(per curiam)*. See *Walton*, 497 U. S., at 659–660 (SCALIA, J., concurring in part and concurring in judgment). In my view, that line of decisions had no proper foundation in the Constitution. *Id.*, at 670 (" '[T]he prohibition of the Eighth Amendment relates to the character of the punishment, and not to the process by which it is imposed' " (quoting *Gardner* v. *Florida*, 430 U. S. 349, 371 (1977) (REHNQUIST, J., dissenting))). I am therefore reluctant to magnify the burdens that our *Furman* jurisprudence imposes on the States. Better for the Court to have invented an evidentiary requirement that a judge can find by a preponderance of the evidence, than to invent one that a unanimous jury must find beyond a reasonable doubt.

On the other hand, as I wrote in my dissent in *Almendarez-Torres* v. *United States*, 523 U. S. 224, 248 (1998), and as I reaffirmed by joining the opinion for the Court in *Apprendi*, I believe that the fundamental meaning of the jury-trial guarantee of the Sixth Amendment is that all facts essential to imposition of the level of punishment that the defendant receives—whether the statute calls them elements of the offense, sentencing factors, or Mary Jane— must be found by the jury beyond a reasonable doubt.

The quandary is apparent: Should I continue to apply the last-stated principle when I know that the only reason the fact *is* essential is that this Court has mistakenly said that the Constitution *requires* state law to impose such "aggra-

vating factors"? In *Walton,* to tell the truth, the Sixth Amendment claim was not put with the clarity it obtained in *Almendarez-Torres* and *Apprendi.* There what the appellant argued had to be found by the jury was not all facts essential to imposition of the death penalty, but rather *"every* finding of fact underlying the sentencing decision," including not only the aggravating factors without which the penalty could not be imposed, but also the *mitigating* factors that might induce a sentencer to give a lesser punishment. 497 U. S., at 647 (emphasis added). But even if the point had been put with greater clarity in *Walton,* I think I still would have approved the Arizona scheme—I would have favored the States' freedom to develop their own capital sentencing procedures (already erroneously abridged by *Furman*) over the logic of the *Apprendi* principle.

Since *Walton,* I have acquired new wisdom that consists of two realizations—or, to put it more critically, have discarded old ignorance that consisted of the failure to realize two things: First, that it is impossible to identify with certainty those aggravating factors whose adoption has been wrongfully coerced by *Furman,* as opposed to those that the State would have adopted in any event. Some States, for example, already had aggravating-factor requirements for capital murder (*e. g.,* murder of a peace officer, see 1965 N. Y. Laws p. 1022 (originally codified at N. Y. Penal Law § 1045)) when *Furman* was decided. When such a State has added aggravating factors, are the new ones the *Apprendi*-exempt product of *Furman,* and the old ones not? And even as to those States that did not previously have aggravating-factor requirements, who is to say that their adoption of a new one today—or, for that matter, even their retention of old ones adopted immediately post-*Furman*—is still the product of that case, and not of a changed social belief that murder *simpliciter* does not deserve death?

Second, and more important, my observing over the past 12 years the accelerating propensity of both state and federal

legislatures to adopt "sentencing factors" determined by judges that increase punishment beyond what is authorized by the jury's verdict, and my witnessing the belief of a near majority of my colleagues that this novel practice is perfectly OK, see *Apprendi, supra,* at 523 (O'CONNOR, J., dissenting), cause me to believe that our people's traditional belief in the right of trial by jury is in perilous decline. That decline is bound to be confirmed, and indeed accelerated, by the repeated spectacle of a man's going to his death because *a judge* found that an aggravating factor existed. We cannot preserve our veneration for the protection of the jury in criminal cases if we render ourselves callous to the need for that protection by regularly imposing the death penalty without it.

Accordingly, *whether or not* the States have been erroneously coerced into the adoption of "aggravating factors," wherever those factors exist they must be subject to the usual requirements of the common law, and to the requirement enshrined in our Constitution, in criminal cases: they must be found by the jury beyond a reasonable doubt.

I add one further point, lest the holding of today's decision be confused by the separate concurrence. JUSTICE BREYER, who refuses to accept *Apprendi,* see 530 U. S., at 555 (dissenting opinion); see also *Harris* v. *United States, ante,* at 569 (BREYER, J., concurring in part and concurring in judgment), nonetheless concurs in today's judgment because he "believe[s] that jury sentencing in capital cases is mandated by the Eighth Amendment." *Post,* at 614 (opinion concurring in judgment). While I am, as always, pleased to travel in JUSTICE BREYER's company, the unfortunate fact is that today's judgment has nothing to do with jury sentencing. What today's decision says is that the jury must find the existence of the *fact* that an aggravating factor existed. Those States that leave the ultimate life-or-death decision to the judge may continue to do so—by requiring a prior jury finding of aggravating factor in the sentencing phase or,

more simply, by placing the aggravating-factor determination (where it logically belongs anyway) in the guilt phase. There is really no way in which JUSTICE BREYER can travel with the happy band that reaches today's result unless he says yes to *Apprendi.* Concisely put, JUSTICE BREYER is on the wrong flight; he should either get off before the doors close, or buy a ticket to *Apprendi*-land.

JUSTICE KENNEDY, concurring.

Though it is still my view that *Apprendi* v. *New Jersey,* 530 U. S. 466 (2000), was wrongly decided, *Apprendi* is now the law, and its holding must be implemented in a principled way. As the Court suggests, no principled reading of *Apprendi* would allow *Walton* v. *Arizona,* 497 U. S. 639 (1990), to stand. It is beyond question that during the penalty phase of a first-degree murder prosecution in Arizona, the finding of an aggravating circumstance exposes "the defendant to a greater punishment than that authorized by the jury's guilty verdict." *Apprendi, supra,* at 494. When a finding has this effect, *Apprendi* makes clear, it cannot be reserved for the judge.

This is not to say *Apprendi* should be extended without caution, for the States' settled expectations deserve our respect. A sound understanding of the Sixth Amendment will allow States to respond to the needs and realities of criminal justice administration, and *Apprendi* can be read as leaving in place many reforms designed to reduce unfairness in sentencing. I agree with the Court, however, that *Apprendi* and *Walton* cannot stand together as the law.

With these observations I join the opinion of the Court.

JUSTICE BREYER, concurring in the judgment.

I

Given my views in *Apprendi* v. *New Jersey,* 530 U. S. 466, 555 (2000) (dissenting opinion), and *Harris* v. *United States,*

*ante,* at 569 (opinion concurring in part and concurring in judgment), I cannot join the Court's opinion. I concur in the judgment, however, because I believe that jury sentencing in capital cases is mandated by the Eighth Amendment.

## II

This Court has held that the Eighth Amendment requires States to apply special procedural safeguards when they seek the death penalty. *Gregg* v. *Georgia,* 428 U. S. 153 (1976). Otherwise, the constitutional prohibition against "cruel and unusual punishments" would forbid its use. *Furman* v. *Georgia,* 408 U. S. 238 (1972) *(per curiam).* JUSTICE STEVENS has written that those safeguards include a requirement that a *jury* impose any sentence of death. *Harris* v. *Alabama,* 513 U. S. 504, 515–526 (1995) (dissenting opinion); *Spaziano* v. *Florida,* 468 U. S. 447, 467–490 (1984) (STEVENS, J., joined by Brennan and Marshall, JJ., concurring in part and dissenting in part). Although I joined the majority in *Harris* v. *Alabama,* I have come to agree with the dissenting view, and with the related views of others upon which it in part relies, see *Gregg, supra,* at 190 (joint opinion of Stewart, Powell, and STEVENS, JJ.). Cf. *Henslee* v. *Union Planters Nat. Bank & Trust Co.,* 335 U. S. 595, 600 (1949) (Frankfurter, J., dissenting) ("Wisdom too often never comes, and so one ought not to reject it merely because it comes late"). I therefore conclude that the Eighth Amendment requires that a jury, not a judge, make the decision to sentence a defendant to death.

I am convinced by the reasons that JUSTICE STEVENS has given. These include (1) his belief that retribution provides the main justification for capital punishment, and (2) his assessment of the jury's comparative advantage in determining, in a particular case, whether capital punishment will serve that end.

As to the first, I note the continued difficulty of justifying capital punishment in terms of its ability to deter crime, to

incapacitate offenders, or to rehabilitate criminals. Studies of deterrence are, at most, inconclusive. See, *e. g.,* Sorensen, Wrinkle, Brewer, & Marquart, Capital Punishment and Deterrence: Examining the Effect of Executions on Murder in Texas, 45 Crime & Delinquency 481 (1999) (no evidence of a deterrent effect); Bonner & Fessenden, Absence of Executions: A special report, States With No Death Penalty Share Lower Homicide Rates, N. Y. Times, Sept. 22, 2000, p. A1 (during last 20 years, homicide rate in death penalty States has been 48% to 101% higher than in non-death-penalty States); see also Radelet & Akers, Deterrence and the Death Penalty: The Views of the Experts, 87 J. Crim. L. & C. 1, 8 (1996) (over 80% of criminologists believe existing research fails to support deterrence justification).

As to incapacitation, few offenders sentenced to life without parole (as an alternative to death) commit further crimes. See, *e. g.,* Sorensen & Pilgrim, An Actuarial Risk Assessment of Violence Posed by Capital Murder Defendants, 90 J. Crim. L. & C. 1251, 1256 (2000) (studies find average repeat murder rate of .002% among murderers whose death sentences were commuted); Marquart & Sorensen, A National Study of the *Furman*-Commuted Inmates: Assessing the Threat to Society from Capital Offenders, 23 Loyola (LA) L. Rev. 5, 26 (1989) (98% did not kill again either in prison or in free society). But see *Roberts* v. *Louisiana,* 428 U. S. 325, 354 (1976) (White, J., dissenting) ("[D]eath finally forecloses the possibility that a prisoner will commit further crimes, whereas life imprisonment does not"). And rehabilitation, obviously, is beside the point.

In respect to retribution, jurors possess an important comparative advantage over judges. In principle, they are more attuned to "the community's moral sensibility," *Spaziano,* 468 U. S., at 481 (STEVENS, J., concurring in part and dissenting in part), because they "reflect more accurately the composition and experiences of the community as a whole," *id.,* at 486. Hence they are more likely to "express the con-

science of the community on the ultimate question of life or death," *Witherspoon* v. *Illinois*, 391 U. S. 510, 519 (1968), and better able to determine in the particular case the need for retribution, namely, "an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death." *Gregg, supra,* at 184 (joint opinion of Stewart, Powell, and STEVENS, JJ.).

Nor is the fact that some judges are democratically elected likely to change the jury's comparative advantage in this respect. Even in jurisdictions where judges are selected directly by the people, the jury remains uniquely capable of determining whether, given the community's views, capital punishment is appropriate in the particular case at hand. See *Harris,* 513 U. S., at 518–519 (STEVENS, J., dissenting); see also J. Liebman et al., A Broken System, Part II: Why There Is So Much Error in Capital Cases, and What Can Be Done About It 405–406 (Feb. 11, 2002) (hereinafter A Broken System) (finding that judges who override jury verdicts for life are especially likely to commit serious errors); cf. Epstein & King, The Rules of Inference, 69 U. Chi. L. Rev. 1 (2002) (noting dangers in much scholarly research but generally approving of Liebman).

The importance of trying to translate a community's sense of capital punishment's appropriateness in a particular case is underscored by the continued division of opinion as to whether capital punishment is in all circumstances, as currently administered, "cruel and unusual." Those who make this claim point, among other things, to the fact that death is not reversible, and to death sentences imposed upon those whose convictions proved unreliable. See, *e. g.,* Weinstein, The Nation's Death Penalty Foes Mark a Milestone Crime: Arizona convict freed on DNA tests is said to be the 100th known condemned U. S. prisoner to be exonerated since executions resumed, Los Angeles Times, Apr. 10, 2002, p. A16; G. Ryan, Governor of Illinois, Report of Governor's Commis-

sion on Capital Punishment 7–10 (Apr. 15, 2002) (imposing moratorium on Illinois executions because, post-*Furman*, 13 people have been exonerated and 12 executed); see generally Bedau & Radelet, Miscarriages of Justice in Potentially Capital Cases, 40 Stan. L. Rev. 21, 27 (1987).

They point to the potentially arbitrary application of the death penalty, adding that the race of the victim and socioeconomic factors seem to matter. See, *e. g.*, U. S. General Accounting Office, Report to Senate and House Committees on the Judiciary: Death Penalty Sentencing 5 (Feb. 1990) (synthesis of 28 studies shows "pattern of evidence indicating racial disparities in the charging, sentencing, and imposition of the death penalty"); Baldus, Woodworth, Zuckerman, Weiner, & Broffitt, Racial Discrimination and the Death Penalty in the Post-*Furman* Era: An Empirical and Legal Overview, With Recent Findings from Philadelphia, 83 Cornell L. Rev. 1638, 1661 (1998) (evidence of race-of-victim disparities in 90% of States studied and of race-of-defendant disparities in 55%); *McCleskey* v. *Kemp*, 481 U. S. 279, 320–345 (1987) (Brennan, J., dissenting); see also, *e. g.*, D. Baldus, G. Woodworth, G. Young, & A. Christ, The Disposition of Nebraska Capital and Non-Capital Homicide Cases (1973–1999): A Legal and Empirical Analysis 95–100 (Oct. 10, 2001) (death sentences almost five times more likely when victim is of a high socio-economic status).

They argue that the delays that increasingly accompany sentences of death make those sentences unconstitutional because of "the suffering inherent in a prolonged wait for execution." *Knight* v. *Florida*, 528 U. S. 990, 994 (1999) (BREYER, J., dissenting from denial of certiorari) (arguing that the Court should consider the question); see, *e. g.*, *Lackey* v. *Texas*, 514 U. S. 1045 (1995) (STEVENS, J., respecting denial of certiorari); Bureau of Justice Statistics, Capital Punishment 2000, pp. 12, 14 (rev. 2002) (average delay is 12 years, with 52 people waiting more than 20 years and some more than 25).

They point to the inadequacy of representation in capital cases, a fact that aggravates the other failings. See, *e. g.*, Bright, Counsel for the Poor: The Death Sentence Not for the Worst Crime but for the Worst Lawyer, 103 Yale L. J. 1835 (1994) (describing many studies discussing deficient capital representation).

And they note that other nations have increasingly abandoned capital punishment. See, *e. g.*, San Martin, U. S. Taken to Task Over Death Penalty, Miami Herald, May 31, 2001, p. 1 (United States is only Western industrialized Nation that authorizes the death penalty); Amnesty International Website Against the Death Penalty, Facts and Figures on the Death Penalty (2002), http://www.web.amnesty.org/rmp/dplibrary.nsf (since *Gregg*, 111 countries have either abandoned the penalty altogether, reserved it only for exceptional crimes like wartime crimes, or not carried out executions for at least the past 10 years); DeYoung, Group Criticizes U. S. on Detainee Policy; Amnesty Warns of Human Rights Fallout, Washington Post, May 28, 2002, p. A4 (the United States rates fourth in number of executions, after China, Iran, and Saudi Arabia).

Many communities may have accepted some or all of these claims, for they do not impose capital sentences. See A Broken System, App. B, Table 11A (more than two-thirds of American counties have never imposed the death penalty since *Gregg* (2,064 out of 3,066), and only 3% of the Nation's counties account for 50% of the Nation's death sentences (92 out of 3,066)). Leaving questions of arbitrariness aside, this diversity argues strongly for procedures that will help assure that, in a particular case, the community indeed believes application of the death penalty is appropriate, not "cruel," "unusual," or otherwise unwarranted.

For these reasons, the danger of unwarranted imposition of the penalty cannot be avoided unless "the decision to impose the death penalty is made by a jury rather than by a single governmental official." *Spaziano*, 468 U. S., at 469

(STEVENS, J., concurring in part and dissenting in part); see *Solem* v. *Helm*, 463 U. S. 277, 284 (1983) (Eighth Amendment prohibits excessive or disproportionate punishment). And I conclude that the Eighth Amendment requires individual jurors to make, and to take responsibility for, a decision to sentence a person to death.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE joins, dissenting.

I understand why the Court holds that the reasoning of *Apprendi* v. *New Jersey*, 530 U. S. 466 (2000), is irreconcilable with *Walton* v. *Arizona*, 497 U. S. 639 (1990). Yet in choosing which to overrule, I would choose *Apprendi*, not *Walton*.

I continue to believe, for the reasons I articulated in my dissent in *Apprendi*, that the decision in *Apprendi* was a serious mistake. As I argued in that dissent, *Apprendi*'s rule that any fact that increases the maximum penalty must be treated as an element of the crime is not required by the Constitution, by history, or by our prior cases. See 530 U. S., at 524–552. Indeed, the rule directly contradicts several of our prior cases. See *id.*, at 531–539 (explaining that the rule conflicts with *Patterson* v. *New York*, 432 U. S. 197 (1977), *Almendarez-Torres* v. *United States*, 523 U. S. 224 (1998), and *Walton, supra*). And it ignores the "significant history in this country of . . . discretionary sentencing by judges." 530 U. S., at 544 (O'CONNOR, J., dissenting). The Court has failed, both in *Apprendi* and in the decision announced today, to "offer any meaningful justification for deviating from years of cases both suggesting and holding that application of the 'increase in the maximum penalty' rule is not required by the Constitution." *Id.*, at 539.

Not only was the decision in *Apprendi* unjustified in my view, but it has also had a severely destabilizing effect on our criminal justice system. I predicted in my dissent that the decision would "unleash a flood of petitions by convicted defendants seeking to invalidate their sentences in whole or

in part on the authority of *[Apprendi]*." *Id.*, at 551. As of May 31, 2002, less than two years after *Apprendi* was announced, the United States Courts of Appeals had decided approximately 1,802 criminal appeals in which defendants challenged their sentences, and in some cases even their convictions, under *Apprendi*.[1] These federal appeals are likely only the tip of the iceberg, as federal criminal prosecutions represent a tiny fraction of the total number of criminal prosecutions nationwide. See *ibid.* (O'CONNOR, J., dissenting) ("In 1998 . . . federal criminal prosecutions represented only about 0.4% of the total number of criminal prosecutions in federal and state courts"). The number of second or successive habeas corpus petitions filed in the federal courts also increased by 77% in 2001, a phenomenon the Administrative Office of the United States Courts attributes to prisoners bringing *Apprendi* claims. Administrative Office of the U. S. Courts, 2001 Judicial Business 17. This Court has been similarly overwhelmed by the aftershocks of *Apprendi*. A survey of the petitions for certiorari we received in the past year indicates that 18% raised *Apprendi*-related claims.[2] It is simply beyond dispute that *Apprendi* threw countless criminal sentences into doubt and thereby caused an enormous increase in the workload of an already overburdened judiciary.

The decision today is only going to add to these already serious effects. The Court effectively declares five States' capital sentencing schemes unconstitutional. See *ante*, at 608, n. 6 (identifying Colorado, Idaho, Montana, and Nebraska as having sentencing schemes like Arizona's). There are 168 prisoners on death row in these States, Criminal Justice Project of the NAACP Legal Defense and Educational Fund, Inc., Death Row U. S. A. (Spring 2002), each of whom

---

[1] This data was obtained from a Westlaw search conducted May 31, 2002, in the United States Courts of Appeals database using the following search terms: "'Apprendi v. New Jersey' & Title['U.S.' or 'United States']."

[2] Specific counts are on file with the Clerk of the Court.

is now likely to challenge his or her death sentence. I believe many of these challenges will ultimately be unsuccessful, either because the prisoners will be unable to satisfy the standards of harmless error or plain error review, or because, having completed their direct appeals, they will be barred from taking advantage of today's holding on federal collateral review. See 28 U. S. C. §§ 2244(b)(2)(A), 2254(d)(1); *Teague* v. *Lane,* 489 U. S. 288 (1989). Nonetheless, the need to evaluate these claims will greatly burden the courts in these five States. In addition, I fear that the prisoners on death row in Alabama, Delaware, Florida, and Indiana, which the Court identifies as having hybrid sentencing schemes in which the jury renders an advisory verdict but the judge makes the ultimate sentencing determination, see *ante,* at 608, n. 6, may also seize on today's decision to challenge their sentences. There are 629 prisoners on death row in these States. Criminal Justice Project, *supra.*

By expanding on *Apprendi,* the Court today exacerbates the harm done in that case. Consistent with my dissent, I would overrule *Apprendi* rather than *Walton.*