**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Filberto ESCOBAR III, Defendant–**
**Appellant.**

No. 03–1870.

United States Court of Appeals,
Sixth Circuit.

Sept. 1, 2004.

John C. Bruha, U.S. Attorney's Office for the Western District of Michigan, Grand Rapids, MI, for Plaintiff-Appellee.

David A. Dodge, Dodge & Dodge, Grand Rapids, MI, for Defendant-Appellant.

Before: KRUPANSKY and GILMAN, Circuit Judges, and MAYS, District Judge.*

KRUPANSKY, Circuit Judge.

The defendant-appellant Filberto Escobar III ("Escobar" or "the defendant") has challenged his 160-month imprisonment sentence imposed following his guilty plea to a charge of conspiracy to possess and distribute five or more kilograms of cocaine plus one thousand or more kilograms of marijuana. Escobar has alleged that the sentencing court improperly penalized him for certain narcotics quantities which were immunized as "proffer information" under his plea bargain contract; and further that additional drug amounts should have been excluded because they were transacted outside the scope of the charged conspiracy. The defendant has protested that the sentencing court should have assigned him an offense level of 32 rather than 34.

Escobar distributed large amounts of controlled substances in the Grand Rapids, Michigan area at least between 1993 through 1999. He transacted some, but not all, of those narcotics in concert with an extensive drug syndicate headed by Huston Rodriguez ("Rodriguez"), the epicenter of which was situated at "My Place Lounge," a disreputable tavern owned and operated by Rodriguez's family. Escobar frequently patronized that public house, and often shared narcotics suppliers and customers with members of the Rodriguez ring. In the late 1990s, Escobar and several additional members of the Rodriguez organization were targeted by a federal Drug Enforcement Administration ("DEA") investigation, while concurrently a separate joint task force of federal and local law enforcement agents commenced an investigation of the overall Rodriguez operation.

As a result of those dual investigations, two distinct indictments named Escobar as a major drug trafficker. On October 4, 2001, a federal grand jury indicted Escobar, his brother Carlos, and Yesenia Torres on a single count of conspiring to possess and distribute cocaine between 1995 and September 2001. In April 2002, federal grand jurors indicted Escobar, together with Rodriguez and others, on one count of conspiracy to distribute at least one thou-

---

* The Honorable Samuel H. Mays, Jr., United States District Judge for the Western District of Tennessee, sitting by designation.

sand kilograms of marijuana and five kilograms of cocaine. Thereafter, Escobar fled the trial court's jurisdiction, seeking refuge in Chicago, Illinois, where he remained a fugitive from justice for several months.

Following his apprehension by federal agents, Escobar pledged his cooperation. In January 2003. Special Agent Gregory Osborne ("Osborne") of the Federal Bureau of Investigation ("FBI") and Agent Terry Glynn ("Glynn") of the DEA conducted a proffer interrogation of the defendant. During approximately the initial hour of that discourse, Escobar patently endeavored to minimize his aggregate involvement in narcotics trafficking, by steadfastly admitting to transacting only single-ounce quantities of cocaine and trivial amounts of marijuana. However, when directly confronted with his brother's revelation that the defendant had distributed a five-kilogram shipment of cocaine, Escobar became more candid about his career drug-dealing activities. At Escobar's sentencing hearing, developed further below, Agent Osborne testified that, during the defendant's two proffer interviews, Escobar had ultimately accepted responsibility for approximately 1,460 pounds of marijuana plus twelve kilograms of cocaine. He had also identified several hitherto-unknown drug suppliers, and specified amounts of contraband substances furnished by each.

On February 10, 2003, the United States Attorney for the Western District of Michigan propounded a Superseding Information which charged Escobar, between 1995 and September 2000, with conspiring, with his brother Carlos, Rodriguez, and others, to possess and distribute five or more kilograms of cocaine plus one thousand or more kilograms of marijuana, in violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A) & 846.

On that same day, February 10, 2003, Escobar waived further indictment and pleaded guilty to the charge stated in the Superseding Information. Via his written Plea Agreement under Fed.R.Crim.P. 11, the defendant *inter alia* pledged his full cooperation with all law enforcement operatives in any investigation of any crime(s), including but not limited to those charged against him. The government in turn promised, among other things, to dismiss the two indictments against him, to refrain from bringing any additional charges against him, and to forbear from using, against the defendant at sentencing, any "proffer" or "cooperation" information supplied to investigators by the defendant. However, the Plea Agreement, paragraph 5(E), also stipulated:

> It is expressly understood, however, that such information may be used by the Government at sentencing if the Defendant takes a position at sentencing that contradicts information provided by the Defendant pursuant to this agreement or any proffer agreement.

(Italics added).

That compact further recited at paragraph 11, in material part:

> **11. Consequences of Breach.** *If the Defendant breaches any provision of this agreement, including any promise of cooperation,* whether before or after sentencing, *the United States shall have the right to terminate this agreement,* or *deny any and all benefits to which the Defendant would otherwise be entitled under the terms of this agreement.* In the event that the United States elects to terminate this agreement, the agreement shall be null and void, and the parties shall return to the same position they were in prior to the execution of this agreement, as though no agreement ever existed.

(Italics added).

On April 30, 2003, Escobar's probation officer completed his Presentence Report

("PSR"). The probation officer related that, during an interview with Escobar attended by defense counsel, the defendant acknowledged narcotics dealings between 1995 and 1999, including his involvement with twelve kilograms of cocaine plus between eight hundred (800) to one thousand (1,000) pounds of marijuana. However, the PSR's author also remarked that major discrepancies distinguished Escobar's quantity admissions from the amounts disclosed by his cohorts. The defendant's accomplices revealed amounts handled by Escobar totaling between 12 to 32 kilograms of powder cocaine plus between 3,602 to 4,702 pounds of marijuana. The presentence document also recorded the impressions of DEA and FBI investigators that Escobar had consistently resisted a full accounting of his activities by minimizing, whenever possible, the implicated narcotics amount(s) and/or his role in any particular transaction.

In conformity with standard practices, the probation officer converted the above-stated drug amounts disclosed by Escobar's confederates into marijuana equivalency, in kilograms, under U.S.S.G. § 2D1.1, comment (n. 10) (Drug Equivalency Tables) (positing, *inter alia*, that one gram of cocaine equals two hundred grams of marijuana),[1] which yielded a total marijuana equivalency between 4,034 and 8,533 kilograms, thus triggering a base offense level of 34. U.S.S.G. § 2D1.1(c)(3) (mandating, among other things, that involvement with between 3,000 and 10,000 kilograms of marijuana establishes a base offense level of 34). The trial court rejected Escobar's objections to the PSR, including his assault, as purportedly unsupported by evidence, against its author's characterization of his proffer and cooperation information as understated and self-serving; as well as his affiliated contention that he should be accountable only for between 1,000 and 3,000 kilograms of marijuana equivalent, which would implicate a base offense level of 32 under U.S.S.G. § 2D1.1(c)(4).

On June 24, 2003, the district judge presided over a sentencing hearing. Contrary to the figures which the defendant had provided during his proffer interviews conducted by the DEA and FBI agents (namely twelve kilograms of cocaine plus 1,460 pounds of marijuana) and his interview with his probation officer (namely twelve kilograms of cocaine plus between 800 to 1,000 pounds of marijuana), he initially admitted, on direct examination, only to five kilograms of cocaine received from his brother Carlos (and he further claimed that he ultimately returned two of those kilograms to Carlos after the defendant's arrest for possession of marijuana with intent to deliver), plus between 400 to 600 pounds of marijuana secured from David Guajardo in Texas. However, during cross-examination, Escobar ultimately conceded that, during his criminal career, he had handled various large quantities of narcotics, acquired from multiple sources, which totaled at least 1,080 pounds of marijuana plus twelve kilograms of cocaine.

Upon examining the data concerning suppliers and drug quantities revealed by Escobar and/or Agent Osborne during the hearing, the sentencing judge tentatively ascribed culpability to Escobar for twelve kilograms of cocaine (which he converted, under the Drug Equivalency Table located in U.S.S.G. § 2D1.1, comment (n. 10), to 2,400 kilograms of marijuana equivalent; 12 kg. of cocaine × 200 = 2,400 kg. of marijuana); plus 1,660 pounds of marijua-

---

1. Additionally, a one kilogram mass of any substance approximately equals a weight of 2.2046 pounds. The American Heritage Dictio-NARY of the English Language, New College Edition 720 (6th ed.1976).

na (which equaled approximately 725 kilograms; 1,600 lb. / 2.2046 lb./kg. = 725.75 kg.). Those figures totaled 3,125 kilograms of marijuana equivalent, which activated a base offense level of 34 under U.S.S.G. § 2D1.1(c)(3).

Defense counsel objected to inclusion of 900 pounds (converted into 408 kilograms) of marijuana from a female source identified by Escobar via his proffer/cooperation information simply as "Nina." During cross-examination at his sentencing hearing, the defendant revealed that, in sum, he had received 900 pounds of cannabis through Nina.[2] During the time period material to the subject prosecution, the authorities had never questioned Nina, nor did they know her full true name or whereabouts. The defendant's opposition was anchored in the dual rationale that Nina's existence, and any provision of drugs by her to Escobar, was proffer-protected material immunized from sentencing consideration; or alternatively that Escobar's unlawful transactions with Nina were extraneous to the charged Rodriguez conspiracy to which he had pleaded guilty. As explicated above, if Escobar had been assigned a marijuana tally only approximately 125 kilograms lower, he would have attained a base offense level of 32. Accordingly, the inclusion of the 408 kilograms of "Nina marijuana" single-handedly elevated the defendant's base offense level from 32 to 34.

In response, the government elicited testimony from Escobar's probation officer, who explained that, in tabulating the defendant's base offense level of 34, he had not directly relied upon *any* drug quanti-

ties conceded or revealed by Escobar, including the "Nina" transactions. Instead, the probation officer anchored his calculation in narcotics amounts attributed to Escobar directly by his co-conspirators in their statements, which totals he then *corroborated* by reconciling them against Escobar's admissions, including proffer material and/or "relevant conduct" narcotics. He did not assign culpability to Escobar for more narcotics than the largest amounts that the defendant had admitted in his various statements. By that method, the probation officer merely tested the veracity of Escobar's compatriots in crime, thereby avoiding the attribution of excessive quantities of "sentencing narcotics" to the defendant.

The trial court overruled both defense objections to the court-determined base offense level of 34. However, it also rejected the PSR's recommendation that Escobar be denied any offense level reduction for acceptance of responsibility by reason of his persistent efforts to minimize his involvement in drug merchandising, and also because of his post-indictment effort to flee from justice. The trial judge granted the defendant a three-point reduction for acceptance of responsibility under U.S.S.G. § 3E1.1, although he commented during the sentencing proceeding that that determination was "a close call" on the pertinent record. Escobar's resulting adjusted offense level of 31, matched with his category-IV criminal history, yielded a guidelines sentencing range of 151 to 188 months. U.S.S.G. § 5A (Sentencing Table).[3] The presiding judge imposed 160

---

**2.** Previously, Escobar had attributed only 300 pounds of marijuana to Nina during his interview with his probation officer.

**3.** If Escobar had persuaded the inferior court that his base offense level should have been 32 instead of 34, his adjusted offense level

would have been 29, which, when coupled with his criminal history category IV, would have produced a guidelines sentencing range of 121 to 151 months. U.S.S.G. § 5A (Sentencing Table).

months of incarceration, to be followed by five years of supervised release, plus a $100 assessment.

■ On review, the defendant has protested that the sentencing court charged an excessive amount of controlled substances (specifically marijuana) against him, either because evidence of some of that marijuana (especially the "Nina marijuana") allegedly should have been excluded as protected proffer evidence,[4] or because it allegedly was transacted outside the reach of the Rodriguez conspiracy. Therefore, Escobar has challenged only the *legal characterization* by the trial court of certain marijuana as properly admissible against him for sentencing purposes; whereas he has *not denied*—instead, he had *admitted* during his proffer interviews—the *fact* of his involvement with a total quantity of narcotics facially sufficient to trigger the assailed base offense level.[5]

Accordingly, if the trial court correctly construed the applicable law, its *factual* judicial narcotics quantification was unassailable, because the defendant had admitted to responsibility for enough controlled substances to authorize a base offense lev-

el of 34. *See Blakely v. Washington,* —— U.S. ——, 124 S.Ct. 2531, 2537, 159 L.Ed.2d 403 (2004) (instructing that, although a sentencing court may not find facts by a preponderance of the evidence which elevates the defendant's sentence above the statutory maximum term justified by the facts found by a jury or admitted by the defendant, "[o]ur precedents make clear, however, that the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*") (italics the Court's; boldface added) (citing, *inter alia, Ring v. Arizona,* 536 U.S. 584, 602, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002); *Apprendi v. New Jersey,* 530 U.S. 466, 483, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000)). Therefore, under even the broadest conceivable construction of *Blakely,* the trial court below did not err by judicially determining sentencing facts by a preponderance of the evidence which ultimately placed Escobar in the same offense level category to which he would have been consigned based solely upon his own factual admissions.

Turning to the issue whether *all* of the marijuana attributed to the defendant by

---

4. In addition to the marijuana purchased from Nina, the defendant has sought, on review, to exclude additional quantities considered by the sentencing court, as averredly proffer-protected. It is questionable whether Escobar directly preserved those objections in the trial court, and thus they might not be cognizable on review. *See, e.g., United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993). However, because, as evolved herein, those additional objections would have been legally misconceived even if they had been fully preserved, this reviewing court need not consider the effect of the defendant's failure to perfect his opposition in the trial court.

5. Although the drug amounts conceded by Escobar during his interrogation by the probation officer, and his testimony during his

sentencing hearing, were insufficient to instigate a base offense level of 34, *his admissions* during his *proffer interviews* linked him to sufficient narcotics to activate that offense level. As developed below, the defendant, by his misconduct, forfeited the immunization of his proffer and cooperation statements.

Escobar disclosed during those discussions that he had trafficked twelve kilograms of cocaine, which, as developed above, constituted 2,400 kilograms of marijuana, plus approximately 1,460 pounds of marijuana, which translated into roughly 662 kilograms (1,460 lbs. / 2.2046 lb./kg. = 662 kg.). Hence, his admitted-to marijuana total was 3,062 kilograms (2,400 kg. + 662 kg. = 3,062), which, if fully allowable against him, would authorize a base offense level of 34. U.S.S.G. § 2D1.1(c)(3).

the sentencing court was lawfully charge-able against him for punitive purposes, irrespective of Escobar's claims that evidence some of those drugs was either protected or outside the range of the charged conspiracy, it is facially evident that the defendant's challenges were legally misconceived. Trial court evidentiary rulings are reviewed for abuse of discretion. *United States v. Spikes,* 158 F.3d 913, 927 (6th Cir.1998). An abuse of discretion occurs "when the reviewing court is firmly convinced that a mistake has been made. A district court abuses its discretion when it relies on clearly erroneous findings of fact, or when it improperly applies the law or uses [an] erroneous legal standard." *Romstadt v. Allstate Ins. Co.,* 59 F.3d 608, 615 (6th Cir.1995) (quotation marks and citations omitted). In ascertaining drug quantities for sentencing purposes, the trial court may make a reasonable estimate, but it should "err on the side of caution," such that it is more likely than not that the quantity charged against the defendant is not over-inclusive.[6] *See United States v. Walton,* 908 F.2d 1289 (6th Cir.1990).

The trial court did not abuse its discretion, nor did it risk unjustifiable over-inclusion, by incorporating into its assessment the "Nina marijuana," as well as any other narcotics which might arguably have been encompassed under ordinary circumstances by the "proffer/cooperation immunity," because Escobar had surrendered immunization of that highly-reliable data by repeatedly breaching his plea bargain agreement, specifically by attempting to conceal from the authorities, including the sentencing court, the full extent of his

narcotics dealings. *See* U.S.S.G. § 1B1.8(b)(4) (positing that information supplied by a defendant pursuant to a cooperation-and-protection agreement may nonetheless be used against the defendant for sentencing purposes "in the event there is a breach of the cooperation agreement by the defendant"). The defendant's various formal statements—namely those given during his two proffer interviews, his interrogation by his probation officer, and his testimony at his sentencing proceeding—were materially inconsistent regarding the extent of his narcotics trade. Most significantly, during his sentencing hearing, while under oath, Escobar on direct examination restricted his admissions to far smaller quantities of drugs than he had acknowledged in his prior statements, which, standing alone, constituted a sufficient violation of his plea agreement and § 1B1.8(b)(4) to authorize the government to use his proffer/cooperation information against him.

At bottom, instead of following the proper course by testifying truthfully and completely, in conformity with his promise solemnized by his plea compact, about all of the narcotics that he had transacted, and then legitimately opposing the use of "protected" quantities against him by the sentencing court, Escobar instead elected to affirmatively deny, under oath, the true extent of his drug-dealing activities, in a manner which flagrantly conflicted with his prior admissions and which was deliberately misleading, incomplete, and perjurious. Accordingly, as a matter of law, the sentencing court rightfully considered the "Nina marijuana," as well as any other

---

6. The credited testimony of a single witness is sufficient to support factual findings by a preponderance of the evidence on sentencing, which will survive "clear error" review, if that evidence bears more than a "minimum indicium of reliability." *See, e.g., United States v. Gessa,* 57 F.3d 493, 496 (6th Cir.

1995). Witness credibility determinations by the trial court normally are not subject to reassessment on review, because the trial judge typically had the unique perspective of observing the witness' demeanor, attitude, and overall behavior while on the witness stand. *Id.*

narcotics admitted by Escobar which might have otherwise been protected, because he violated his plea-bargain covenant of cooperation. *See United States v. Barnes,* 278 F.3d 644, 646 (6th Cir.2002) (explaining that the ultimate question of whether a party breached a plea agreement is one of law examined *de novo* ); *United States v. Wells,* 211 F.3d 988, 995 (6th Cir.2000) (same).

■ The defendant's alternative argument fares no better. Even if, as he has alleged, he had transacted some of the charged narcotics beyond the temporal or functional boundaries of the Rodriguez conspiracy, the district judge had properly attributed those substances against him as "relevant conduct" drugs. *See* U.S.S.G. § 1B1.3. "[I]n a drug distribution case, quantities and types not specified in the count of conviction are to be included in determining the offense level if they were part of the same course of conduct or part of a common scheme or plan as the count of conviction."[7] U.S.S.G. § 1B1.3, comment. (backg'd). Escobar's "independent" drug enterprise was manifestly part of the "same course of conduct" and/or a "common scheme or plan" as his charged "conspiratorial" narcotics business transacted

with the Rodriguez organization, as both were integral components of his uninterrupted lifelong career as a dope peddler.

A career drug merchant such as Escobar faces "relevant conduct" liability for *all* narcotics trafficked by him, even if he was convicted of conspiratorial distribution that in itself accounted only for a portion of his lifetime total of illegal narcotics sales. *United States v. Miller,* 910 F.2d 1321, 1326–27 (6th Cir.1990) (affirming the inclusion, as relevant conduct, of *all* drugs sold by the defendant during a twenty-month period, including those that predated his three-month affiliation with the charged conspiracy). Thus, no legal error infected the lower court's reliance, as "relevant conduct" sentencing material, upon otherwise-proper evidence of narcotics dispensing by Escobar that may have exceeded the outer perimeters of the Rodriguez syndicate's activities.

Accordingly, no abuse of discretion or legal mistake tainted Escobar's sentencing, even if the trial court had relied upon cooperation or proffer information and/or evidence of drug dealing by the defendant that was extraneous to the charged conspiracy. To the contrary, on the subject record, the sentencing judge displayed

---

7. Wrongful activities may be considered part of **"the same course of conduct"**

if they are *sufficiently connected or related to each other as to warrant the conclusion that they are part of a single episode, spree, or ongoing series of offenses.* Factors that are appropriate to the determination of whether offenses are sufficiently connected or related to each other to be considered as part of the same course of conduct include *degree of similarity of the offenses, the regularity (repetitions) of the offenses, and the time interval between the offenses.* When one of the above factors is absent, a stronger presence of at least one of the other factors is required. For example, where the conduct alleged to be relevant is relatively remote to the offense of conviction, a stronger showing of similarity or regularity

is necessary to compensate for the absence of temporal proximity. The nature of the offenses may also be a relevant consideration (*e.g.,* a defendant's failure to file tax returns in three consecutive years appropriately would be considered as part of the same course of conduct because such returns are only required at yearly intervals). U.S.S.G. § 1B1.3, comment. (n. 9) (italics added).

Such activities may be deemed part of a **"common scheme or plan"** if they are "connected to each other by at least one common factor, such as common victims, common accomplices, common purpose, or similar *modus operandi.*" *Id.* (emphasis in original). *See also United States v. Hill,* 79 F.3d 1477, 1481–85 (6th Cir.1996).

perhaps excessive generosity with regard to both the total narcotics quantification as well as the allowance of an "acceptance of responsibility" offense level reduction. The defendant's judgment of conviction and sentence is **AFFIRMED**.