

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

No. AP-75,539

STEVEN LYNN LONG, Appellant

v.

THE STATE OF TEXAS

Direct Appeal from Case No. F05-52918-R of the
265th Judicial District Court,
Dallas County

*WOMACK, J., delivered the opinion for a unanimous Court.*

Steven Lynn Long appeals from his conviction for the May 21, 2005, capital murder of

Kaitlyn Smith.[1] A jury found the appellant guilty, and its answers to the special issues in Code of

Criminal Procedure Article 37.071, sections 2(b) and 2(e), required the trial court to sentence the

---

[1] *See* PENAL CODE § 19.03(a)(2).

appellant to death.[2] Appeal to this court is mandatory.[3] After reviewing the appellant's six points of error, we find them to be without merit. Consequently, we affirm the trial court's judgment and sentence of death.

**Facts**

Kaitlyn Smith and her mother and stepfather lived in a trailer park in Dallas County. Kenneth Edwards, Deborah Dawn Porter, and her eight-year-old daughter Savanah lived in a trailer across the street, and the appellant had recently moved in with them.

On May 20, 2005, Kaitlyn's parents hosted a party. The guests included the appellant, Edwards, Porter, and several others. During the party, Kaitlyn's mother agreed that Kaitlyn could spend the night with Savanah at her trailer across the street. Savanah's mother and the appellant were the last guests to leave the party. When they got back to the trailer, Savanah's mother asked the appellant to check on the girls. He reported that they were asleep. Savanah's mother went to bed.

In the morning, Savanah's mother checked on the girls and discovered that Kaitlyn was missing. Once it became apparent that Kaitlyn had not returned to her own trailer, a full-blown search of the trailer park ensued. Kaitlyn's grandfather soon found her body, wrapped partially in trash bags, underneath a vacant trailer. The appellant became a suspect, and later that evening, homicide detectives secured his confession to the rape and murder of Kaitlyn Smith.

---

[2] *See* CODE CRIM. PROC. art. 37.071, § 2(g). Unless otherwise indicated, all references to Articles refer to the Code of Criminal Procedure.

[3] *See* CODE CRIM. PROC. art. 37.071, § 2(h).

## I. Did the trial court's jury instructions violate the appellant's constitutional rights?

In his first point of error, the appellant contends that the trial court's instructions on the second special issue[4] at the punishment phase of his trial violated the Fifth, Eighth, and Fourteenth Amendments of the United States Constitution.[5] The jury instructions regarding the second special issue, in pertinent part, were as follows:

> In deliberating on your answer to Special Issue No. 2, you are instructed that you may not answer Special Issue No. 2 "No" unless the jury agrees unanimously, and you may not answer Special Issue No. 2 "Yes" unless 10 or more members of the jury agree. The members of the jury need not agree on what particular evidence supports an affirmative answer to Special Issue No. 2. In arriving at your answer, you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness.
> You are further instructed that if the jury returns an affirmative finding on Special Issue No. 1 and a negative finding on Special Issue No. 2, the Court shall sentence the defendant to death. If the jury returns a negative finding on Special Issue No. 1 or an affirmative finding on Special Issue No. 2, the Court shall sentence the defendant to confinement for life in the Institutional Division of the Texas Department of Criminal Justice.

The appellant argues specifically that these instructions (1) prevented the jury from giving due consideration to mitigating evidence in violation of *Mills v. Maryland*;[6] (2) undermined the jury's sense of responsibility for imposing a death sentence, in violation of the Eighth Amendment, and rendered the sentencing proceeding so unfair as to deny the appellant due process; (3) failed to assign to the State the burden to prove beyond a reasonable doubt that a death sentence was

---

[4] The trial court submitted Special Issue Two to the jury as follows: "Do you find, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed?"

[5] The appellant's point of error also claimed that the indictment contained the same constitutional violations as the jury instructions. However, his brief addresses only the jury charge, and he provides no separate argument or authority to support the allegation regarding the indictment. Therefore, we consider only the jury instructions here. *See Salazar v. State*, 38 S.W. 3d 141, 147 (Tex. Cr. App. 2001); R. APP. P. 38.1(h).

[6] *Mills v. Maryland*, 486 U.S. 367 (1988).

merited, thereby denying the appellant due process; and (4) as regards the mitigation issue, were excessively vague, resulting in arbitrary and capricious sentencing patterns, in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

In his first and second subissues, the appellant urges that the jury instructions violated the tenets of *Mills*. He argues that the jury instructions inaccurately stated the law by giving the impression that, in order to impose a life sentence instead of death, ten jurors needed to answer the second special issue affirmatively. The appellant reasons that the instructions thus misled the jury, such that a juror would have believed that she could not give effect to mitigating evidence without nine other jurors joining her. The instructions therefore unconstitutionally minimized each juror's responsibility for imposing a death sentence, especially given that jurors were repeatedly told of the gravity of their decision. The inaccuracy, he maintains, rendered the sentencing proceeding so unfair that the imposition of the death penalty amounted to a denial of due process, in violation of the Eighth and Fourteenth Amendments to the Constitution.

This court has consistently rejected similar challenges and upheld the constitutionality of the instructions at issue, known as the "10-12 rule."[7] We find nothing in the appellant's arguments to alter our decision here. We therefore reject the appellant's contention.

In his third subissue, the appellant argues that the jury instructions violated his due-process rights by failing to place on the State the burden of proving the mitigation issue beyond a reasonable doubt. He argues that the due-process requirement that every fact necessary to constitute a crime be proved beyond a reasonable doubt extends to "all elements that result in

---

[7] *See, e.g., Prystash v. State*, 3 S.W.3d 522, 536 (Tex. Cr. App. 1999); *McFarland v. State*, 928 S.W.2d 482, 519-20 (Tex. Cr. App. 1996), *overruled on other grounds*; *Lawton v. State*, 913 S.W.2d 542, 558-59 (Tex. Cr. App. 1995).

imposition of a penalty of death." He relies for support on *Apprendi v. New Jersey*[8] and *Ring v. Arizona*.[9] In *Apprendi*, the Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."[10] The appellant contends that the mitigation issue falls within this mandate and therefore warrants a jury instruction that the State bears the burden to prove it beyond a reasonable doubt.

This court has previously rejected such a claim.[11] *Apprendi* and *Ring* apply only to facts that increase the penalty beyond the maximum penalty authorized by statute.[12] Because the maximum statutory penalty under Article 37.071 is death, and the jury's answer to the mitigation issue therefore cannot increase the penalty beyond the maximum the statute allows, *Apprendi* is inapplicable to the mitigation special issue.[13] Furthermore, we have held that neither party bears the burden of proof as to the mitigation issue, and the holding in *Apprendi* does not affect that decision.[14] We reject the appellant's argument.

---

[8] 530 U.S. 466 (2000).

[9] 536 U.S. 584 (2002).

[10] *Apprendi*, 530 U.S., at 490.

[11] *See Blue v. State*, 125 S.W.3d 491, 501 (Tex. Cr. App. 2003); *Resendiz v. State*, 112 S.W.3d 541, 550 (Tex. Cr. App. 2003).

[12] *Ibid*.

[13] *Ibid*.

[14] *Ibid*.

In his final subissue, the appellant contends that the jury instructions run afoul of the Supreme Court's requirement, as expressed in *Furman v. Georgia*,[15] that the death penalty be imposed in a manner that is not arbitrary and capricious. He argues that the definition of "mitigating evidence" in Article 37.071[16] limits a jury to considering evidence only of a capital defendant's moral culpability or blameworthiness and prevents its consideration of positive character traits. Cumulatively, he claims, the jury instructions' inaccurate statement of law with regard to the "10-12 rule," their failure to assign a burden of proof or state the standard for that burden, and a limited statutory definition of "mitigating evidence" cumulatively rendered the instructions arbitrary and capricious, resulting in the appellant's death sentence being "wantonly and freakishly" applied, in violation of the Eighth Amendment and Due Process Clause.

We have previously decided the issue regarding the definition of "mitigating evidence" adversely to the appellant,[17] and we reject it here as well. We also have previously overruled a point of error, similar to the appellant's, regarding the cumulative effect of jury charge errors.[18]

Because we reject each of the appellant's arguments regarding the constitutionality of the jury instructions on the mitigation issue, we overrule his first point of error.

---

[15] 408 U.S. 238 (1972).

[16] Article 37.071, § 2(f)(4) defines "mitigating evidence" as "evidence that a juror might regard as reducing the defendant's moral blameworthiness."

[17] *See Cantu v. State*, 939 S.W.2d 627, 648-49 (Tex. Cr. App. 1997). ("There is no evidence that must be viewed by a juror as being *per se* mitigating. Instead, jurors must individually determine what evidence, if any, mitigates against the imposition of the death penalty and what weight, if any, to give that evidence in its consideration. Article 37.071 § 2(e) yields further support to this interpretation in that it requires the court to instruct the jury to take into consideration '*all* of the evidence, *including* the circumstances of the offense, the defendant's character and background, *and* the personal moral culpability of the defendant' in determining whether sufficient mitigating circumstances exist to warrant a life sentence." (Emphasis added in *Cantu*.))

[18] *See Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Cr. App. 1999). ("[W]e are aware of no authority holding that non-errors may in their cumulative effect cause error.")

**II. Did the trial court err in instructing the jury on the definition of "probability"?**

In his second point of error, the appellant claims that the trial court violated his due-process rights and his Eighth Amendment right to freedom from cruel and unusual punishment by failing to instruct the jury on the definition of the word "probability" as it was used in Special Issue One.[19] He argues that the lack of a definition rendered the term unconstitutionally vague and "violated the constitutional requirement that each statutory aggravating circumstance genuinely narrow the class of persons eligible for the death penalty." This court has previously rejected this identical claim and said that well-settled law requires no such definition in the jury charge.[20] We overrule the appellant's second point of error.

**III. Was the evidence legally sufficient to support future dangerousness?**

In his third point of error, the appellant challenges the legal sufficiency of the evidence supporting the jury's affirmative answer to the first special issue concerning the appellant's future dangerousness.[21]

When determining whether a defendant will pose a continuing threat to society, a jury may consider many factors.[22] Of these factors, the circumstances of the capital offense itself "can

---

[19] The trial court submitted Special Issue One to the jury as follows: "Do you find from the evidence beyond a reasonable doubt that there is a probability that the defendant, Steven Lynn Long, would commit criminal acts of violence that would constitute a continuing threat to society?" *See* CODE CRIM. PROC. art. 37.071, § 2(b)(1).

[20] *See Chamberlain*, 998 S.W.2d, at 237-38; *King v. State*, 553 S.W.2d 105, 107 (Tex. Cr. App. 1977).

[21] *See supra* note 19.

[22] The factors a jury may consider include, but are not limited to: (1) the circumstances of the capital offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of the defendant's acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record, and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *Wardrip v. State*, 56 S.W.3d 588, 594 n.7 (Tex. Cr. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Cr. App. 1987).

be among the most revealing evidence of future dangerousness and alone may be sufficient to support an affirmative answer to that special issue."[23] The jury may also consider all evidence presented at both the guilt and the punishment stages of the trial.[24] In reviewing a jury's decision on the special issue, "we must view all of the evidence before the jury in the light most favorable to its finding, and then determine whether, based on that evidence and reasonable inferences therefrom, a rational jury could have found beyond a reasonable doubt that the answer to the first punishment issue was 'yes.'"[25]

Here, the appellant argues that, in all likelihood, he will spend the rest of his life in prison, and thus, the only relevant "society" for the jury's consideration on future dangerousness is prison society. He looks to his prison record as a predictor of future conduct there, and concludes that it does not support an affirmative finding on the future-dangerousness issue.[26] However, this court has repeatedly held that, in determining whether a defendant poses a continuing threat to society, the jury considers both free society and prison society.[27] That the appellant, had he been sentenced to life imprisonment, would not have been eligible for parole until after serving forty years[28] was not relevant to the jury's decision.[29]

---

[23] *Druery v. State*, 225 S.W.3d 491, 507 (Tex. Cr. App. 2007); *Wardrip*, 56 S.W.3d, at 594.

[24] *Ladd v. State*, 3 S.W.3d 547, 557-58 (Tex. Cr. App. 1999); *Valdez v. State*, 776 S.W.2d 162, 166-67 (Tex. Cr. App. 1989).

[25] *Ladd*, 3 S.W.3d, at 558.

[26] In his brief, the appellant goes so far as to admit that if he were released back into society in the foreseeable future, he might pose a risk.

[27] *See, e.g., Morris v. State*, 940 S.W.2d 610, 613 (Tex. Cr. App. 1996).

[28] The law applicable to the appellant allowed parole for a defendant sentenced to life imprisonment for a capital offense. Article 37.071 was amended in 2005, to eliminate parole as an option for defendants so sentenced. *See* Act of June 17, 2005, 79th Leg., R.S., ch. 787, §§ 6-9, 2005 Tex. Gen. Laws 2705, 2706-07 (current version at

We find that a rational jury could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. The record, including the appellant's own confession, establishes that the appellant raped and murdered an eleven-year-old girl. The forensic evidence showed that the appellant had inflicted extensive blunt-force injuries throughout Kaitlyn's body, including her head, neck, mouth, chest, back, legs, and hands. He had also caused massive internal trauma to both Kaitlyn's neck and her pelvic region. The tissue separating Kaitlyn's vagina and anus had been severely damaged, and Dr. McClain testified that, in her nineteen years as a medical examiner, she had never before seen sexual-assault injuries of such magnitude. While there was evidence that the appellant had been drinking, there was also evidence that suggested that he may not have been impaired by any intoxication.

The evidence during punishment showed that the appellant had an extensive history of violence and brutality. The appellant's medical records document a psychological evaluation when he was fifteen years old which revealed several problem areas, including homicidal and suicidal tendencies. He had been in a common-law marriage, during which, according to the testimony of his ex-wife, he repeatedly raped her and beat her, even when she was pregnant, causing her to miscarry once. Shortly before the birth of his second child, the appellant tried to attack his wife with a butcher knife. Testimony also showed that the appellant raped a thirteen-

CODE CRIM. PROC. art. 37.071, §§ 1, 2(a)(1), 2(e), 2(g)).

[29] *See Morris*, 940 S.W.2d, at 613 ("Because the length of appellant's incarceration does not reduce or increase his future dangerousness, it is not relevant to that issue.").

year-old girl and had relationships with two other women who described the appellant's angry, violent, and sexually abusive behavior.

The appellant previously had been convicted and sentenced for attempted murder for his participation in a drive-by shooting in 1991. While in prison, the appellant committed about twenty disciplinary violations, including participating in a prison riot and freeing himself from restraints.

Based on the totality of the evidence, we find that a rational jury could have answered the future-dangerousness issue in the affirmative. Point of error number three is overruled.

### IV. Is the Texas capital sentencing scheme unconstitutional for failing to provide for meaningful appellate review?

In his fourth point of error, the appellant contends that Texas' capital sentencing scheme is unconstitutional because it does not permit meaningful appellate review. The appellant argues that, because the second special issue does not specify mitigating and aggravating factors, nor does it require jurors to make specific findings, an appellate court has no way of knowing what factors the jury considered in making its decision. Meaningful appellate review is therefore impossible, he claims.

This court has repeatedly rejected this argument,[30] and we have said, "So long as the jury is not precluded from hearing and effectuating mitigating evidence, we have never regarded appellate review of mitigating evidence to be an essential component of a constitutionally acceptable capital punishment scheme."[31] Point of error four is overruled.

---

[30] *See, e.g., Russeau v. State*, 171 S.W.3d 871, 886 (Tex. Cr. App. 2005); *Prystash*, 3 S.W.3d, at 536; *McFarland*, 928 S.W.2d, at 498-99.

[31] *McFarland*, 928 S.W.2d, at 499.

## V. Is the death penalty as administered in Texas unconstitutional?

In his fifth point of error, the appellant contends that Texas's lethal-injection protocol violates his right to be free from cruel and unusual punishment under the Eighth and Fourteenth Amendments. The appellant concedes that the procedure has not been found to be unconstitutional by any court. But he argues that Texas has yet to allow a hearing on this issue, and asks that we remand the case to the trial court for a hearing on the merits of his claim, or alternatively, that we take judicial notice of certain testimony and other published studies which support his position. The State counters that the appellant failed to preserve the issue for appeal by failing to make the claim with adequate specificity.

We agree with the State that the appellant has failed to preserve error. The appellant raised the issue only as a one-sentence paragraph in a pre-trial Motion to Set Aside the Indictment, which challenged the constitutionality of the statute. The paragraph reads: "Death by lethal injection is cruel and unusual punishment in violation of the Eight[h] and Fourteenth Amendments of the United States Constitution and Article I §~10, 13 and 19 of the Texas Constitution." Before voir dire, the appellant also made an oral motion to set aside the indictment, referring to the written motion generally. But he failed to explain the basis for his claim with any further specificity.

Texas Rule of Appellate Procedure 33.1(a) requires that, in order to preserve a complaint for appellate review:

> [T]he record must show that the complaint was made to the trial court by a timely request, objection, or motion that stated the grounds for the ruling that the complaining party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, unless the specific grounds were apparent from the context.

The appellant's claim in his pre-trial motion, that death by lethal injection is cruel and unusual punishment, is not equivalent to his complaint on appeal that the present lethal injection protocol used in Texas violates the Eighth Amendment. His complaint failed to meet the requirements of Rule 33.1(a). Because the appellant has not preserved the issue for appeal, point of error five is overruled.

## VI. Did the trial court err by admitting autopsy photographs into evidence?

The appellant's sixth and final point of error alleges that the trial court erred in allowing "highly prejudicial" autopsy photographs into evidence over his timely objection. He alleges that the photographs were inadmissible as unfairly prejudicial under Texas Rule of Evidence 403. The appellant argues that, because his guilt was "virtually conceded" during the trial, the autopsy photographs, specifically State's Exhibits 75 through 110,[32] were not relevant to his guilt or innocence and, therefore, had little probative value. He also contends that many of the photographs were not referenced at all in the testimony. And he claims that, particularly with regard to State's Exhibits 94 through 102, which were images of internal organs, this lack of explanation prejudiced jurors by giving them no frame of reference from which to determine the normality of the images.

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value "is substantially outweighed by the danger of unfair prejudice."[33] "Rule 403 favors the admission

---

[32] The appellant mistakenly identifies State's Exhibit 111 as an autopsy photograph in one portion of his brief, but elsewhere he correctly refers to the photographs at issue as State's Exhibits 75-110. State's Exhibit 111 is actually a "Consent to Search" form signed by the appellant, rather than an autopsy photograph.

[33] TEX. R. EVID. 403. Rule 403 also allows for the exclusion of relevant evidence if the probative value is substantially outweighed by the danger of confusion of the issues or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence. These specific objections, however, were not raised here.

of relevant evidence and carries a presumption that relevant evidence will be more probative than prejudicial."[34] The admissibility of a photograph under Rule 403 is within the sound discretion of the trial judge.[35] We will reverse the trial judge's decision only for an abuse of discretion, that is, only if the decision falls outside the zone of reasonable disagreement.[36]

A trial court may consider several factors in determining whether photographs are unfairly prejudicial. These factors include: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are color or black-and-white, whether they are close-up, whether the body depicted is clothed or naked, the availability of other means of proof, and other circumstances unique to the individual case.[37]

We note at the outset that, contrary to the appellant's arguments, each autopsy photograph was specifically referenced by number or description in the medical examiner's testimony. Furthermore, because the appellant did not plead guilty, the State was required to prove each element of the charged offense regardless of the appellant's strategy at trial regarding the issue of his guilt or innocence.

All of the photographs in question were taken during the medical examiner's investigation. State's Exhibits 75 through 110 were introduced during the testimony of Deputy Chief Medical Examiner Joni McClain. According to Dr. McClain's testimony, which we

---

[34] *Gallo*, 239 S.W.3d, at 762; *Hayes v. State*, 85 S.W.3d 809, 815 (Tex. Cr. App. 2002).

[35] *Prible v. State*, 175 S.W.3d 724, 734 (Tex. Cr. App. 2005); *Sonnier v. State*, 913 S.W.2d 511, 518 (Tex. Cr. App. 1995).

[36] *Salazar v. State*, 38 S.W.3d 141, 151 (Tex. Cr. App. 2001).

[37] *Prible*, 175 S.W.3d, at 734; *Santellan v. State*, 939 S.W.2d 155, 172 (Tex. Cr. App. 1997); *Long v. State*, 823 S.W.2d 259, 272 (Tex. Cr. App. 1991).

summarize here, State's Exhibits 76 through 80 show hemorrhaging and contusions which are indicative of strangulation.[38] State's Exhibits 81 through 93 show various contusions throughout the body, which are evidence of blunt-force trauma.[39] Additionally, State's Exhibits 88 and 89 are consistent with Kaitlyn's having held her hand up to fend off an attack. State's Exhibits 94 and 95 show traumatic injury to the vagina and anal region,[40] and State's Exhibits 96 through 103 show various internal injuries Kaitlyn sustained during the assault.[41] State's Exhibits 104 through 110 show injuries to Kaitlyn's body consistent with bite marks.[42]

---

[38] State's Exhibit 75 is a frontal image of the unclothed body from head to mid-thigh showing an overall view of the body's condition. State's Exhibits 76-77 show hemorrhaging around the whites of the right and left eyes, respectively; State's Exhibit 78 shows abrasions and contusions around the right side of the neck; State's Exhibit 79 shows similar bruising to the neck and also the chin; State's Exhibit 80 shows similar bruising along the left side of the neck.

[39] State's Exhibit 81 shows areas of contusion on the chest; State's Exhibit 82 shows a small abrasion on the back, while the other purple areas are postmortem blood settling rather than injury; State's Exhibit 83 shows bruising on the upper left shoulder; State's Exhibit 84 shows the same thing as State's Exhibit 83, except on the right side; State's Exhibit 85 shows a bruise on the arm; State's Exhibit 86 shows an abrasion on the back; State's Exhibit 87 shows bruises on the leg; State's Exhibit 88 shows bruises on the palm of the right hand; State's Exhibit 89 shows more bruising on the right hand; State's Exhibit 90 shows an area of contusion on the left forearm; State's Exhibits 91-93 show contusions on the upper and lower lips.

[40] State's Exhibit 94 shows lacerations and contusions on the vaginal tissue along the vaginal canal to the cervix; State's Exhibit 95 shows the area of tissue between the anal region and the vagina, measuring an abnormally-thin one-eighth inch.

[41] State's Exhibit 96 shows bruising and hemorrhage under the reflected scalp, indicating blunt trauma on the right side of the head; State's Exhibit 97 shows the neck organs, with hemorrhaging throughout the thyroid region; State's Exhibit 98 shows the front portion of the neck organs and hemorrhage of the thyroid cartilage; State's Exhibit 99 shows hemorrhage of the thyroid gland, after having been removed from the body; State's Exhibit 100 shows the other side of the thyroid gland; State's Exhibit 101 shows hemorrhage around the hyoid bone; State's Exhibit 102 shows hemorrhage around the cervix, the bottom portion of the uterus, and the ovaries; State's Exhibit 103 shows hemorrhage around the rectum and anal region that indicates "significant external penetration."

[42] State's Exhibits 104-106 show various views of a bite mark on the left buttock; State's Exhibits 107 and 108 shows different views of a bite mark on the right buttock; State's Exhibits 109 and 110 show different views of a bite mark on the right cheek.

The detailed, graphic, and gruesome photographs are undoubtedly prejudicial. But we find that they are not unfairly so, that is, we find that the prejudicial effect of these photographs does not substantially outweigh their probative value.

In her testimony, Dr. McClain explained that Kaitlyn's death was caused by strangulation, but that had Kaitlyn somehow survived the strangulation, the extensive blunt-force trauma injuries to her pelvic region could also have caused her death by blood loss or infection. Dr. McClain used each one of the photographs to support and elucidate her findings. The photographs are highly probative, therefore, because they demonstrate the nature and extent of the injuries Kaitlyn sustained, provide evidence of the cause and manner of her death, and were necessary to the State in developing its case. Furthermore, the injuries depicted were all sustained as part of the same continuous transaction, show the mental state of the appellant during the assault and murder, and show the specific circumstances of the crime.[43]

The thirty-six photographs at issue were presented to the jury as "letter-sized," color images. None of these images is unnecessarily duplicative. In the majority of the photographs, the body has been unaltered by the autopsy. Although these photographs are gruesome, they are no more gruesome than the injuries caused by the appellant himself.[44]

In the remaining photographs, the body has been altered by the autopsy. Although "autopsy photographs are generally admissible unless they depict mutilation of the victim caused

[43] *See Rojas v. State*, 986 S.W.2d 241, 249-50 (Tex. Cr. App. 1998) (upholding the admission of autopsy photographs of injuries to the groin where the evidence suggested that the appellant inflicted them during the same continuous transaction, even though the injuries were not the direct cause of the victim's death; photographs were also probative of the appellant's mental state and the specific circumstances of the murder).

[44] *See Gallo*, 239 S.W.3d, at 763; *Narvaiz v. State*, 840 S.W.2d 415, 429-30 (Tex. Cr. App. 1992).

by the autopsy itself,"[45] the "mutilation" is not fatal to the photographs' admissibility.[46] The autopsy's internal examination was critical to Dr. McClain's findings and conclusions. It was thus also critical that jurors be able to see the photographic evidence of the full extent of the injuries and the cause and manner of Kaitlyn's death.[47]

As to the appellant's argument regarding State's Exhibits 94 through 102, we find it has no merit. Contrary to the appellant's claim, Dr. McClain gave the jury a "frame of reference" for each of the images at issue. She used the photographs to supplement her testimony by clearly pointing out the contents of each one of the photographs and explaining what they contributed to the evidence.

Because the probative value of the autopsy photographs was not substantially outweighed by the danger of unfair prejudice, we find that the trial judge did not abuse his discretion in admitting the challenged exhibits.

### Conclusion

We affirm the trial court's judgment and sentence of death.

Delivered April 8, 2009.
Do not publish.

---

[45] *Hayes*, 85 S.W.3d, at 816; *accord Santellan*, 939 S.W.2d, at 172.

[46] *See Ripkowski v. State*, 61 S.W.3d 378, 392-93 (Tex. Cr. App. 2001); *Salazar*, 38 S.W.3d, at 150-53.

[47] *See Gallo*, 239 S.W.3d, at 763; *Harris v. State*, 661 S.W.2d 106, 108 (1983).