# Supreme Court of Florida

----------

No. SC15-1823
----------

**MATTHEW LEE CAYLOR,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

----------

No. SC16-399
----------

**MATTHEW LEE CAYLOR,**
Petitioner,

vs.

**JULIE L. JONES, etc.,**
Respondent.

[May 18, 2017]

PER CURIAM.

Matthew Lee Caylor appeals an order of the circuit court denying his motion

to vacate his conviction of first-degree murder and sentence of death filed under

Florida Rule of Criminal Procedure 3.851 and petitions this Court for a writ of

habeas corpus.  We have jurisdiction.  See art. V, § 3(b)(1), (9), Fla. Const.  For the reasons stated below, we grant Caylor's petition for a writ of habeas corpus, vacate Caylor's death sentence, and remand for a new penalty phase.  We affirm, however, the trial court's denial of postconviction relief.

## FACTS AND PROCEDURAL HISTORY

Following a jury trial, Matthew Caylor was convicted of first-degree murder, sexual battery involving great physical force, and aggravated child abuse for the 2008 murder of Melinda Hinson.  Caylor v. State, 78 So. 3d 482, 486 (Fla. 2011).  The jury recommended death by a vote of eight to four, which the trial court followed in its sentencing order.  Id.  This Court set forth the following facts on direct appeal:

> In July 2008, Melinda Hinson was living with her mother, her mother's boyfriend, her fifteen-year-old brother, and Daryl Lawton, a family friend, in a single room at the Valu-Lodge Motel in Panama City.  The family had moved to Florida from Kentucky in December 2007 and Lawton came to live with the family soon after.  Due to strained finances, all five moved to the motel in mid-June.  The room was crowded and the children did not have school during the summer, so Melinda would spend most of her time by the motel's pool.  Melinda would also walk two dogs belonging to Scott Heinze and Tyler Nichols, who also lived at the motel, while Heinze and Nichols were at work.
> According to the motel's records, Matthew Caylor checked into the motel on June 25, 2008.  At trial, Lawton testified that prior to the date of Melinda's disappearance, he had only spoken with Caylor a few times and that he had never seen Melinda or her brother speak with Caylor.  However, at around noon on July 8, Caylor came to Lawton and asked to borrow some duct tape, which Lawton took to Caylor's room.  Later in the day, Caylor called Lawton and asked if

he could also borrow a steak knife. Again, Lawton went to Caylor's room to take him the item. Lawton recalled that Melinda and her brother accompanied him on one of these occasions, but said that they did not speak to Caylor.

Melinda was last seen alive shortly after 5 p.m. on July 8, when she returned Heinze and Nichols' dogs to their room after taking the dogs for a walk. When Melinda did not return to her family's room, the family first asked Heinze and Nichols whether they had seen her. Heinze told the family that he had last seen Melinda when she returned the dogs to their room. The family then searched the motel and the surrounding area. When they could not find Melinda, they called the police and reported that the girl was missing.

Melinda's body was discovered on the morning of July 10, hidden under a bed in a room two doors down from Heinze and Nichols' room. The body was found naked and lying face-down. The discovery was made by a housekeeper who was following the motel's requirement of checking under the beds for trash. Although the room had been cleaned the previous day, the first housekeeper to clean the room testified that she did not look under the bed that day because her back was hurting. A review of the motel's records revealed that Matthew Caylor had been renting the room on the day of Melinda's disappearance. Officers of the Panama City Police Department subsequently learned that Caylor had been arrested in connection with a different criminal matter and that he was already in the custody of the Bay County Sheriff's Department.

Detective Mark Smith of the Panama City Police Department testified at trial that he interviewed Caylor after the body was discovered. He was accompanied by Investigator Mike Wesley of the Bay County Sheriff's Department, who had interrogated Caylor following the initial arrest. When Smith and Wesley went to see Caylor, Caylor said that he was glad to see the officers because he wanted to talk to them. The officers read Caylor his Miranda [v. Arizona, 384 U.S. 436 (1966),] rights, which he waived. In the interrogation that followed, Caylor confessed to the murder of Melinda Hinson and described the circumstances leading up to the crime. Based on Caylor's statements and evidence recovered from the crime scene, Caylor was charged with first-degree murder (based on both premeditation and felony murder theories of the offense), see § 782.04(1)(a) 1.-2., Fla. Stat. (2008), sexual battery involving great

physical force, see § 794.011(3), Fla. Stat. (2008), and aggravated child abuse, see § 827.03(2), Fla. Stat. (2008).

In statements made initially to the police officers and later to the trial court, Caylor gave the following account of the murder and the events leading up to it. In the summer of 2008, Caylor was on felony probation in the State of Georgia based on an incident that had occurred several years before in which he was accused of molesting the fourteen-year-old daughter of a neighbor. Caylor asserted that he was falsely accused, but said that on his attorney's advice he pled guilty to avoid a possible prison sentence. He was later required to register as a sex offender after violating the terms of his probation by being convicted of possession of cocaine. Caylor stated that after several years he became frustrated with the restrictions placed on him as a sex offender, and said that he told his probation officer that he would rather serve time in jail and be done with the sentence. Caylor said that he then went to Panama City to relax because he thought he would have to spend approximately a year and a half in jail. Caylor admitted that he had not been given permission by his probation officer to leave Georgia, even though he knew he was required to receive such permission by Georgia law.

Caylor decided to rent a room at the Valu-Lodge Motel because it was close to the beach. While in Panama City, Caylor began selling cocaine and methamphetamine. He said that he also became friends with "two Russian girls," and that he became romantically involved with one of the girls, Marina. He said that he discovered on July 8 that the women had stolen some of his drugs. Caylor said that he borrowed a knife and duct tape with the intent of using it to threaten them to get his drugs back. He subsequently went to the women's apartment, taking the knife and duct tape with him. Caylor said that he became violent during that encounter and decided to go back to his room at the motel. He was later arrested for the incident at the apartment.

During his interrogation, Caylor told Smith and Wesley that he returned to his motel room immediately after the incident at the women's apartment. He said that he had been back in his room for only a few minutes when Melinda Hinson knocked on his door and asked him for a cigarette. He told the officers that at the time Melinda came to his room, he felt that he had "been through all of this because of something I didn't do," and told the officers that he decided he was "going to make it worth it." When asked during the Spencer hearing

- 4 -

what he meant by these statements, Caylor responded that he meant he was angry about his prior conviction for child molestation. He told the trial court he felt that "[i]f I'm going to be in trouble for having sex with this girl being in my room, I might as well have sex with this girl."

After Melinda entered the room, Caylor said that she sat down on the bed and that they began smoking. He asked her what she had been doing. Melinda replied that she had just finished walking a dog that belonged to the men in the next room. Caylor asked how old she was and she told him that she was thirteen. He said that he asked her why she hung out with the guys next door. Melinda responded that "they think they're hot stuff" but said that she "[did]n't really like them." According to Caylor, Melinda then told him that she thought he was "hot," moved close to him on the bed and put her arm around him. Caylor said that they started kissing, that he took her clothes off, and that they started having sex.

Caylor said that at some point he "just started choking her." He claimed that they had stopped having sex just before he began to strangle her. He said that he "wasn't into it" and that the intercourse lasted for only thirty to forty-five seconds. However, he said that they were still naked when he began to strangle her and that he was still on top of her. Caylor said that when he began to choke Melinda, "she was flipping out and I just wanted her to go away." He said that she began fighting him and saying, "[L]et me ask you a question, let me ask you a question," and that during the struggle they fell from the bed to the floor. Caylor told the officers that he then unplugged the phone cord from the wall and wrapped it around her neck. The officers asked whether Melinda was moving when he began to strangle her with the cord, and Caylor responded: "Well, yeah, it was like no, no," When he thought Melinda was dead, he released her and plugged the phone cord back into the wall. He then lifted up the mattress and placed Melinda and her clothes under the bed. He said that he gathered his things and left the room.

Detective Smith asked Caylor why he decided to kill Melinda:

[Detective Smith:] Well, is your thoughts that now I've had sex with her she's going to tell? Is that what led to that she has to die?

[Caylor:] No, it wasn't like that, no, it wasn't like that, it was just like, it was like, more or less like you're the fucking reason why

I'm in this situation I'm in now because I did the right thing.  I think it was more of a hate, like a hate, like I was really angry, I think is what it was.

[Detective Smith:]  A hate for her or a hate the fact [sic] that she's 13 years old.

[Caylor:]  That she was 13 coming on to me.

Caylor said that when Melinda came into his room, he was "all pissed off about everything that has happened, not to mention the fact of what just happened at Marina's house."  He said that Melinda "just kind of walked up at the wrong, with, you know, with that same bull shit, man, at the wrong time."

At trial, the State called several witnesses to describe physical evidence recovered from the crime scene.  Brenda Pelfrey, a crime scene investigator, identified photographs of the motel room where the body was discovered.  She stated that the victim's clothes, which were found underneath the body, were not ripped or torn and that there was no blood on the victim's underwear.  Pelfrey was also present during the autopsy, where she collected a sexual assault kit.  Trevor Seifert, a crime lab analyst, testified that he found Melinda's DNA on portions of the phone cord removed from the motel room, and that Caylor was a possible contributor to scrapings taken from under Melinda's fingernails.  Seifert also stated that vaginal swabs from the victim tested positive for blood and semen, and that Caylor's DNA profile matched these samples.

The jury also heard testimony from Dr. Michael Hunter, the medical examiner who conducted the autopsy.  Dr. Hunter stated that during the examination he observed considerable injuries to the victim's neck.  He found that some of these injuries were consistent with strangulation by hand, while other straight-line markings showed strangulation by ligature.  He agreed that the latter markings could have been inflicted through the use of a telephone cord.  Dr. Hunter noted that there were multiple straight-line abrasions, which indicated application and reapplication of the ligature.  He determined that these markings were most likely inflicted while the victim was still alive.  He also observed bleeding in the victim's eyes, which provided further evidence of strangulation.  Dr. Hunter ultimately concluded that the cause of death was strangulation.  He said that the victim

would have been in pain while she was conscious, and noted that there was no evidence of any head trauma that might have impaired her ability to feel pain or made her unaware of what was happening around her.

In addition to evidence of strangulation, Dr. Hunter observed other injuries on the body, including a bruise on the victim's arm, a small abrasion on her left ankle, and another large bruise that extended over the length of the left side of her clavicle. He said that there was considerable bleeding underneath the clavicle bruise. Additionally, Dr. Hunter observed discoloration in the victim's pubic area, although he said that this injury could have occurred during consensual sex. He noted that the victim was menstruating at the time of death, but found no indication as to whether she was sexually active. He said that the victim's blood tested positive for nicotine but negative for drugs or alcohol.

After the jury convicted Caylor of all three charged offenses, a penalty proceeding was held. The State's only witness at this proceeding was Thomas Shakitra, who testified that he was employed as a probation officer with the State of Georgia. Shakitra stated that in 2008, he was supervising Caylor, who was on felony probation. Following this testimony, the defense stipulated that Caylor had a prior felony conviction in Georgia.

The defense called four witnesses during the penalty phase. The appellant's parents, Kimberly and Kerry Caylor, testified that they were both addicted to amphetamines while the appellant was a child and that for a time the family had no money and lived in a trailer with no power. Both parents testified that the appellant had an abusive relationship with his father, began abusing drugs at a young age, and suffered from emotional problems. A third defense witness testified that he worked with the appellant as a mechanic in Jasper, Georgia, and described the appellant's drug problems. The final defense witness was a veterinarian who testified that Matthew Caylor had worked in the kennel area of his office for several months. He stated that Caylor was a good employee and treated the animals well. At the end of the proceeding, the jury recommended the death penalty by a vote of eight to four.

The trial court held a Spencer hearing on November 18, 2009. Caylor testified in his own defense and described the events preceding the murder. He said that contrary to his initial statement to the police, he had used a large amount of drugs on the day of the homicide. He

stated that he decided to have sex with Melinda because he was angry about the fact that he had been on probation for eight years for an offense he did not commit, and that he was angry because he found himself in a similar situation with a thirteen-year-old girl. He said that he did not rape Melinda and that he was remorseful for killing her.

In its written sentencing order, the trial court found and assigned weight to the following aggravating circumstances: (1) the capital felony was committed by a person previously convicted of a felony and under a sentence of imprisonment or placed on community control or on felony probation (great weight); (2) the capital felony was committed while the defendant was engaged in the commission of sexual battery and aggravated child abuse (great weight); and (3) the capital felony was especially heinous, atrocious, or cruel ("HAC") (great weight). The court found the following mitigating circumstances: (1) dysfunctional family (little weight); (2) under the influence of an extreme mental or emotional disturbance (some weight); (3) compassionate to animals and good employee (little weight); (4) learning difficulties (very little weight); and (5) remorse (little weight).

The trial court concluded that the nature and quality of the mitigating factors "pale[d] in comparison" to the enormity of the aggravating circumstances. Furthermore, the court determined that the aggravating circumstances clearly and convincingly outweighed the mitigating factors. Based on these determinations, the trial court imposed a sentence of death.

Id. at 486-91 (footnotes omitted). On appeal, Caylor raised six claims[1] and this

---

1. Caylor argued: (1) the trial court erred in denying his motion for judgment of acquittal on the offense of aggravated child abuse; (2) the trial court erred in denying his motion for judgment of acquittal on the offense of sexual battery involving great force; (3) the trial court erred in finding as an aggravating circumstance that he committed the murder while on felony probation; (4) the trial court erred in assigning "little weight" to the "dysfunctional family" and "remorse" mitigating circumstances; (5) death is a disproportionate punishment; (6) Florida's death penalty is unconstitutional under the holding of Ring v. Arizona, 536 U.S. 584 (2002). Caylor, 78 So. 3d at 491.

Court affirmed the convictions and sentences. Id. at 502. The United States

Supreme Court denied certiorari on May 14, 2012. Caylor v. Florida, 132 S. Ct.

2405 (2012).

On May 2, 2013, Caylor filed his original postconviction motion. The

motion raised six claims.[2] On August 7, 2013 the court conducted a Huff[3] hearing

and summarily denied claim 1 (in part) and claim 3 (in part), with the court

reserving ruling on whether claim 4 required further evidentiary consideration.

The court granted an evidentiary hearing on claim 1 (in part), regarding Juror

Marianne Moore, claim 2, regarding counsel's failure to investigate and present

mitigation evidence during the penalty phase and claim 3 (in part), regarding

counsel's failure to have a mental health professional testify with respect to

Caylor's mental state during the penalty phase. The remaining claims were to be

---

2. Caylor argued: (1) trial counsel was ineffective during voir dire for failing to challenge jurors, properly inquire of them, and to move to strike the entire panel; (2) trial counsel was ineffective during the penalty phase for failing to investigate and present mitigation evidence; (3) trial counsel was ineffective during the penalty phase for failing to use a mental health expert to present evidence of mental health mitigation; (4) denial of constitutional rights due to Rule of Professional Conduct 4-3.5(d)(4) prevented trial counsel from interviewing jurors and is unconstitutionally vague; (5) execution by lethal injection violates the Eighth Amendment prohibition against cruel and unusual punishment; and (6) cumulative error.

3. Huff v. State, 622 So. 2d 982 (Fla. 1993).

resolved without an evidentiary hearing.  The evidentiary hearing took place on June 1–2, 2015.  Following the evidentiary hearing, the court filed a final order denying Caylor's postconviction motion on September 9, 2015.  This appeal followed.

## RULE 3.851 MOTION ON APPEAL

Caylor has raised the following five issues on this appeal: (1) trial counsel was ineffective for his investigation and presentation of mitigation evidence at the penalty phase; (2) trial counsel was ineffective for not ensuring that Caylor receive a reasonably competent mental health evaluation for mitigation; (3) the trial court erred in summarily denying Caylor's claim that counsel was ineffective for failing to challenge Juror Weaver; (4) the trial court erred in summarily denying the claim that trial counsel was ineffective for failing to ask any of the jurors about their views on mental health, addiction, remorse, rehabilitation, mercy, experts, or any other potential mitigation; and (5) cumulative error.  Because we find that Caylor is entitled to a new penalty phase, we only address issue three concerning Juror Weaver.  As to this issue, we affirm the trial court's ruling and its denial of Caylor's postconviction motion.

## Juror Weaver

Caylor argues that the trial court erred in summarily denying that counsel was ineffective for failing to challenge Juror Weaver.  According to Caylor, Juror

Weaver indicated that she was not sure if she could be impartial, knew one of the witnesses, and was once the victim of a crime. The postconviction court summarily denied this claim, finding that Caylor failed to show that an actually biased juror sat on the jury panel.

A defendant is entitled to an evidentiary hearing on a postconviction motion unless: (1) the motion, files, and records in the case conclusively show that the movant is entitled to no relief, or (2) the motion or particular claim is legally insufficient. Valentine v. State, 98 So. 3d 44, 54 (Fla. 2012). A postconviction court's decision on whether to grant an evidentiary hearing is a pure question of law, reviewed de novo. Mann v. State, 112 So. 3d 1158, 1162 (Fla. 2013). For a defendant to show that his trial counsel was ineffective during the jury selection process for failing to remove a juror from the panel, that defendant must show that an actually biased juror sat on his jury. Carratelli v. State, 961 So. 2d 312, 324 (Fla. 2007).

In support of his claim, Caylor relies on the following colloquy with Juror Weaver:

> THE COURT: No. Have you ever been a victim of crime or the party in a lawsuit?
> JUROR WEAVER: I had a wallet stolen.
> THE COURT: Okay, would that affect your ability to sit on this case?
> JUROR WEAVER: This one might.
> THE COURT: Pardon?
> JUROR WEAVER: This might.

THE COURT: Okay. Do you think because of that, you wouldn't be able to sit on this case or other reasons?

JUROR WEAVER: I can sit.

THE COURT: Okay. Let's see. Have you had any experiences with the State Attorney's office or law enforcement that would influence your decision?

JUROR WEAVER: No, ma'am.

. . . .

THE COURT: And do you feel that you could be fair and impartial on this case?

JUROR WEAVER: I might.

THE COURT: Pardon?

JUROR WEAVER: I might.

THE COURT: You might. You're not sure?

JUROR WEAVER: No ma'am.

Caylor also relies on questioning by the State during voir dire that revealed that

one of the witnesses, Margaret Davis, was the aunt of Juror Weaver's two

daughters:

JUROR WEAVER: Margaret Davis.

MS. BASFORD: Margaret Davis, yes, ma'am. You know Ms. Davis?

JUROR WEAVER: Yes.

MR. BASFORD: How do you know Ms. Davis?

JUROR WEAVER: The lady who worked at the hotel?

MR. BASFORD: Yes, ma'am.

JUROR WEAVER: She's my two daughters' aunt.

MR. BASFORD: Excuse me?

JUROR WEAVER: She's my two daughters' aunt.

MR. BASFORD: She's your two daughters' aunt?

JUROR WEAVER: Uh huh.

MR. BASFORD: Oh, okay, okay. Well, she is going to be a witness in this case. Now, my question is, usually we don't have people that are, you know, that closely related. Do you see her that often, ma'am?

JUROR WEAVER: No.

MR. BASFORD: Okay. If she testifies, and well, there's no if, she is going to testify, Good Lord willing she's going to testify, could you weigh and evaluate her testimony as you would that of the other witnesses in this case?
JUROR WEAVER: Yes.
MR. BASFORD: The Judge will give you some criteria to judge the witnesses' testimony. But you could do that?
JUROR WEAVER: Yes, sir.

We agree with the postconviction court's determination and find that the

record refutes any claim that an actually biased juror sat on the jury. In regards to

Juror Weaver's comment that she was not sure if she could be impartial, Mr.

Basford later rehabilitated her through the following exchange:

MR. BASFORD: All right. I've got a question mark down here whether or not you could be impartial. How do you feel about it after sitting here this far in this case?
JUROR WEAVER: I'm in favor of the death penalty.
MR. BASFORD: Okay.
JUROR WEAVER: In some cases.
MR. BASFORD: In some cases you're in favor of the death penalty. Do you think you can be fair and impartial in this case?
JUROR WEAVER: Yes, sir.

Additionally, Juror Weaver stated that in regard to Margaret Davis, she would

weigh and evaluate her testimony as she would the other witnesses. She also stated

that she did not see Margaret Davis that often. As evidenced by the record, trial

counsel was not ineffective because Juror Weaver clearly indicated that she could

be fair and impartial, and there is no evidence that she was actually biased.

Consequently, we deny relief as to this claim.

- 13 -

## HABEAS PETITION

Caylor raises three claims in his petition for writ of habeas corpus filed with this Court.  He contends that (1) section 775.082(2) requires that all death-sentenced capital felons receive life sentences without parole; (2) he is entitled to a new penalty phase under Hurst v. Florida, 136 S. Ct. 616 (2016), because the jury verdict at the sentencing phase was not unanimous; and (3) appellate counsel provided ineffective assistance of counsel by failing to raise an Ake v. Oklahoma, 470 U.S. 68 (1985), claim on direct appeal.  As mentioned previously, we find merit in Caylor's second claim and grant him a new penalty phase.

## Application of Hurst v. Florida

Caylor argues that he is entitled to a new penalty phase under Hurst v. Florida, because the jury verdict at the sentencing phase was not unanimous. During the pendency of Caylor's case, the United States Supreme Court found Florida's death penalty scheme unconstitutional.  Hurst v. Florida, 136 S. Ct. at 619.  We have interpreted Hurst v. Florida to require a jury to unanimously find each aggravating factor, that the aggravating factors are sufficient to warrant death, and that the aggravating factors outweigh the mitigation.  See Hurst v. State, 202 So. 3d 40, 57-58, 66-69 (Fla. 2016).  We have also determined that most defendants sentenced to death after the Ring decision should receive the benefit of

Hurst. See Mosley v. State, 209 So. 3d 1248 (Fla. 2016). Caylor, whose sentence was final in 2012, is one such defendant.

Because Hurst applies to Caylor, we must consider whether it is clear beyond a reasonable doubt that a rational jury would have unanimously found all the facts necessary for the imposition of death and unanimously recommended death, such that any Hurst error is harmless. See Mosley, 209 So. 3d at 1284. In this case, the jury's recommendations of death were not unanimous and the jury made no findings concerning the aggravating and mitigating circumstances. The jury recommended death for the murder of Melinda Hinson by a vote of eight to four. Therefore, we cannot conclude that the error in Caylor's penalty phase was harmless beyond a reasonable doubt. Accordingly, Caylor is entitled to a new penalty phase.[4]

### Section 775.082(2)

Caylor also argues that section 775.082(2), Florida Statutes (2016), requires that all death sentenced capital felons receive life sentences without parole. We previously rejected this claim in Hurst. Hurst, 202 So. 3d at 65 ("[W]e conclude that the statute does not mandate automatic commutation to life sentences after the

---

4. Because we find that Caylor is entitled to a new penalty phase, we do not address Caylor's argument that appellate counsel was ineffective for failing to raise an Ake claim on direct appeal.

- 15 -

decision in <u>Hurst v. Florida</u>.").  Therefore, we deny Caylor's claim that he is entitled to a life sentence under section 775.082(2).

## CONCLUSION

For the reasons stated above, we affirm the trial court's denial of postconviction relief.  However, we grant Caylor habeas relief, vacate his death sentence as unconstitutional under <u>Hurst</u>, and remand to the trial court for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
POLSTON, J., concurs in part and dissents in part with an opinion, in which CANADY and LAWSON, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

POLSTON, J., concurring in part and dissenting in part.

I concur with the majority's decision except its vacating of the death sentence pursuant to <u>Hurst</u>.

CANADY and LAWSON, JJ., concur.

An Appeal from the Circuit Court in and for Bay County,
 James Ball Fensom, Judge - Case No. 032008CF002244XXAXMX
And an Original Proceeding – Habeas Corpus

Michael P. Reiter, Ocala, Florida,

 for Appellant/Petitioner

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Marilyn Muir Beccue, Assistant Attorney General, Tampa, Florida,

for Appellee/Respondent